1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| HONORIO QUIROZ, | ) | CV F 03-5181 AWI SMS |
| | ) | |
| **Plaintiff**, | ) | **MEMORANDUM OPINION AND** |
| **v.** | ) | **ORDER GRANTING IN PART** |
| | ) | **AND DENYING IN PART** |
| ERNEST J. LICALSI, and COUNTY OF | ) | **DEFENDANTS' MOTION FOR** |
| MADERA, a Municipal Corporation | ) | **SUMMARY JUDGMENT** |
| and Public Entity, | ) | |
| | ) | (Document #58 & 77) |
| **Defendant**. | ) | |
| | ) | |

## BACKGROUND

On March 13, 2003, Plaintiff filed an amended complaint for damages.   The amended complaint names District Attorney Ernest J. LiCalsi ("LiCalsi") and the County of Madera ("the County") as the Defendants.   In the first cause of action, Plaintiff alleges that LiCalsi violated his Fourth, Fifth, and Fourteenth Amendment rights.   In the second cause of action, Plaintiff alleges that the County is liable for the deprivation of Plaintiff's constitutional rights.

On April 7, 2003, the County filed a motion to dismiss the amended complaint.   On July 28, 2003, the court granted the County's motion in part.   The court dismissed the claims brought under the Fifth Amendment and struck the claim for punitive damages against the County.

On May 6, 2005, Defendants filed a motion for summary judgment.   Defendants contend that LiCalsi did no actions, either personally or as a supervisor, that could have amounted to a violation of Plaintiff's Fourth or Fourteenth Amendment rights.   Defendants contend that LiCalsi is entitled to absolute prosecutorial immunity for his prosecutorial decision.   Defendants

contend that LiCalsi is entitled to qualified immunity.    Defendants contend that LiCalsi is entitled to summary judgment on the case against him in his official capacity because he is entitled to sovereign immunity and LiCalsi is a redundant defendant.   Defendants contend that there is no liability against the county because no constitutional violation occurred and there is no evidence of an unconstitutional policy or custom that was the moving force behind the alleged constitutional violations.

After receiving additional time in which to oppose Defendants' motion, on June 27, 2005, Plaintiff filed an opposition.    Plaintiff contends that LiCalsi personally, as a supervisor, and as a policy maker for the County violated Plaintiff's Fourth Amendment Rights and Plaintiff's substantive due process rights.    Plaintiff contends that LiCalsi is not entitled to absolute or qualified immunity because this matter was only at the investigative stage.

On July 15, 2005, Defendants filed a reply.    Defendants contend that LiCalsi's assignment of an informal investigation was appropriate, neither Benabente nor LiCalsi violated Plaintiff's rights by stopping Plaintiff and detaining him for questioning, LiCalsi is entitled to absolute prosecutorial immunity for his decision to meet with Plaintiff and determination not to prosecute, and LiCalsi did not violate Plaintiff's substantive due process rights because Plaintiff benefitted from the conference and admits he owed the $500.

After continuing the hearing on Defendants' motion for summary judgment until other motions could be resolved, on November 21, 2005, the court held a hearing on Defendants' motion.   After hearing oral arguments the court took the pending motion under submission.

**FACTS**

Plaintiff Honorio Quiroz (date of birth September 25, 1980) came to the United States from Mexico, crossing the border illegally in April 2001.   He purchased a false social security card and does not have a visa or a work permit.

Plaintiff did not have a California driver's license at the times relevant to this action and was also not licensed to drive in Mexico. At the time of the subject accident, Plaintiff knew that

2

he had to have car insurance to drive a car in California, but did not obtain insurance, in part because he did not have a driver's license.

Plaintiff speaks Spanish and does not speak or understand English.

On October 16, 2002, Plaintiff was involved in a motor vehicle accident with Defendant Ernest LiCalsi's son, Eric LiCalsi, in the parking lot of the south campus of Madera High School where Eric LiCalsi was a student.   At the time of the accident, Plaintiff was operating a 1992 white Mercury Topaz, which was owned by a Mr. Laca and registered to Luis Saldivar. Plaintiff was at the high school to drop off 14 year old Adriana Hernandez, who was present when the accident occurred.

After backing into Eric LiCalsi's vehicle, Plaintiff stopped, got out of his vehicle, and observed that he had caused damage to the other vehicle.  Plaintiff realized that he was the party responsible for the accident and responsible for the cost of fixing the damage to the other vehicle.

Liz Torrez, the high school security person who speaks some Spanish, heard the accident and came over.  Plaintiff informed the security guard that he did not have insurance or a license. He provided the vehicle registration and expired insurance information, which indicated that Luis Saldivar was the registered owner of the vehicle.

Plaintiff testified that he gave his name to Eric LiCalsi and the security guard at the scene of the accident, but later changed that testimony to indicate that he gave the false name of *Jose Luis Santiago* at the accident scene, writing it down on a piece of paper and handing it to Eric LiCalsi.   Plaintiff gave Eric LiCalsi a false name so that he would not have to pay for the damage he had caused to Eric LiCalsi's vehicle.

Eric LiCalsi, who does not speak Spanish, wrote down the license plate numbers of the two involved vehicles.  Eric LiCalsi also provided his name and driver's license number to Plaintiff at the accident scene.

Plaintiff made no attempt to contact Eric LiCalsi to arrange to pay for the damage he had caused.

3

Plaintiff was subject to arrest and could have been charged with violations of Vehicle Code Section 12500 (driving without a valid driver's license) and Section 20002(a) (hit and run driver) as a result of the accident.   The vehicle involved in the hit and run could have been seized.

On October 16, 2002, LiCalsi learned from his son, Eric LiCalsi, that his car had been hit by another vehicle in the parking lot at the high school.  Eric LiCalsi provided LiCalsi with a piece of paper with the registered owner's name of Luis Saldivar; the driver's name of Jose Luis Santiago, which the adverse driver had written down; insurance information; and the license number of the car.  LiCalsi also understood from what his son advised him that the driver of the car did not have a driver's license.

This information was given to LiCalsi's insurance company.  Several days later, LiCalsi's insurance company advised him that the insurance information supplied by the driver at the scene was no longer valid.  LiCalsi determined that the name the driver had given was false.

LiCalsi then contacted Sgt. Ken Alley of the Madera Police Department regarding making a report of the incident.[1]   LiCalsi understood from Sgt. Alley that the Madera Police Department did not make reports concerning accidents in school parking lots, but that they would consider doing a report if he could identify the driver.[2]

LiCalsi understood from what his son had told him that the other driver only spoke Spanish.[3]   Therefore, on October 22, 2002, LiCalsi asked the only Spanish-speaking investigator in his office, Fabian Benabente, to locate and identify the other driver.

Defendants offer as an undisputed fact that LiCalsi did not direct Benabente to bring

---

[1]  Plaintiff cannot admit or deny this fact.   Because Plaintiff offers no evidence to refute this fact, it is deemed undisputed.

[2]  Plaintiff cannot admit or deny this fact.   Because Plaintiff offers no evidence to refute this fact, it is deemed undisputed.

[3]  Plaintiff cannot admit or deny this fact.   Because Plaintiff offers no evidence to refute this fact, it is deemed undisputed.

4

Plaintiff to his office.   Defendants cite to the Declaration of Ernest J. LiCalsi, Paragraph Numbers 5 and 13.   In disputing this fact, Plaintiff cites to the Deposition of Daniel Poole, Vol. III, pp. 346-347, the Deposition of Matthew Markle, Vol. 1, pp. 26-30, and the Deposition of Fabian Benabente, pp. 97-98.   Mr. Poole's deposition states that LiCalsi told Poole that he was going to use Benabente to find the person who had caused the accident and get LiCalsi's $500 deductible back.   Mr. Poole's deposition offers no evidence regarding whether Benabente was specifically told to bring Plaintiff to the District Attorney's office.   Benabente's deposition also offers no evidence that LiCalsi specifically told Benabente to bring Plaintiff to the District Attorney's office.   Mr. Benabente testified that the "plan" was to "resolve the problem," which meant to attempt to obtain LiCalsi's money instead of filing charges because once charges were filed LiCalsi would probably not get his money back.   Markle does state in his deposition that Benabente told him that LiCalsi had told Benabente to locate the driver, stop him, and transport him to the District Attorney's Office to cite him for driving without a license.   Defendants contend that Markle's testimony is hearsay.   It is possible that Markle's statements are admissible as statements against LiCalsi's interest and because they provide Benabente's state of mind; but the parties have not briefed this evidentiary issue.   For the purposes of this motion, it is unnecessary to consider Markle's testimony.   For the purposes of this motion, the court will find that LiCalsi did not specifically direct Benabente to transport Plaintiff to the District Attorney's office.   However, based on the evidence of LiCalsi's and Benabente's "plan", the court finds a disputed issue of fact on what steps LiCalsi should have anticipated Benabente would take to facilitate the plan.

Although LiCalsi's father is part Hispanic, LiCalsi has only a limited ability to speak and understand Spanish.[4]

LiCalsi provided Benabente with a post-it with the name Jose Luis Santiago on it; a DMV

---

[4] Plaintiff cannot admit or deny this fact.   Because Plaintiff offers no evidence to refute this fact, it is deemed undisputed.

printout of the vehicle; and verbally provided details of the accident.

At the time that LiCalsi assigned the case to Mr. Benabente, he considered himself to be the victim of a crime.[5]   LiCalsi also considered the driver of the vehicle that hit his son to be in violation of Penal Code Section 12500 (driving without a license) and Vehicle Code Section 20002(a) (hit and run driver).

The parties dispute whether it was LiCalsi's intention to identify the driver of the car and refer the case for prosecution.   Defendants provide the declaration of LiCalsi, Paragraph Number 6, indicating that this was his intention.   However, Plaintiff offers evidence that LiCalsi's intention was to identify the driver and get his $500 back.   The deposition of Fabian Benabente states that the "plan" was to "resolve the problem," which Benabente stated meant to obtain LiCalsi's $500.   See Benabente Depo. at 97-98; 116-18.   LiCalsi's admission in his deposition that he never once told anyone that it was his intention to refer the case to prosecution is circumstantial evidence that LiCalsi did not intend to refer the case.   See LiCalsi Depo. at 39-40. Poole's testimony also confirms that LiCalsi's intent was to obtain his $500 because LiCalsi told Poole he was using Benabente to locate Plaintiff and obtain his $500.   See Poole Depo. at 346- 48.   Thus, there is a disputed issue of fact on LiCalsi's intention upon finding Plaintiff.

The parties dispute whether it was appropriate for LiCalsi to request this investigation. Defendants offer the opinion of Colusa County District Attorney John R. Poyner, that LiCalsi actions were proper.   Plaintiffs offer the deposition of Poole, stating that he believed it was unprofessional to have Benabente locate Plaintiff and obtain LiCalsi's $500. See Poole at 346- 48.   LiCalsi also admitted that prosecuting Plaintiff for the accident would be a conflict of interest for the District Attorney's office, see LiCalsi Depo. at 28, and he should not be the one to make the decision on whether to file charges based on the violations that were observed when Plaintiff was pulled over by Benabente, see id. at  88-89.   Poole's testimony taken with

---

[5]  Plaintiff cannot admit or deny this fact.   Because Plaintiff offers no evidence to refute this fact, it is deemed undisputed.

1  LiCalsi's admission that making a decision to prosecute or charge Plaintiff would be a conflict of

2  interest is circumstantial evidence that LiCalsi requesting an investigation by the District

3  Attorney's office was also inappropriate.  Thus, the appropriateness of LiCalsi's actions is a

4  disputed issue of fact.[6]

5        Benabente understood from what LiCalsi had said that the individual who caused the

6  accident had given LiCalsi's son false information, including the false name of Jose Luis

7  Santiago.  Benabente considered this to be a misdemeanor offense of hit and run.

8        The parties dispute whether Benabente understood his assignment to be to find out who

9  the adverse driver really was.   Defendant offers the deposition of Benabente at page 61, where

10 Benabente testified LiCalsi told him to find out who Plaintiff really was.   However, Plaintiff

11 offers the testimony of Poole, in which Poole testified LiCalsi told Poole he was using Benabente

12 to locate Plaintiff and obtain his $500.   See Poole Depo. at 346-48, Vol. III, pp. 332-33; 346.

13 The deposition of Benabente also states that the "plan" was to "resolve the problem," which

14 Benabente stated meant to obtain LiCalsi's $500.   See Benabente Depo. at 97-98; 116-18.  In

15 addition, LiCalsi's admission in his deposition that he never once told anyone that it was his

16 intention to refer the case to prosecution is circumstantial evidence that LiCalsi did not intend to

17 refer the case.  See LiCalsi Depo. at 39-40.   Thus, there is a disputed issue of fact on whether

18 Benabente's assignment was to find the driver or to find the driver and obtain LiCalsi's $500.

19       LiCalsi did not give Benabente detailed instructions about what to do when he located the

20 adverse driver.  He specifically did not tell Benabente to arrest the adverse driver, to threaten

21 him with arrest, to threaten him with criminal prosecution, or to threaten him with deportation.

22 While Plaintiff disputes this fact, the only evidence regarding LiCalsi telling Benabente to arrest

23 or detain Plaintiff comes from Mr. Markle.  See Markle Depo. at 26-30.   While it is undisputed

24

25        [6]   Plaintiff also offers the deposition of Benabente to support his position.   However, a
   review of Benabente's deposition indicates Benabente only offered his opinion that it was not
26 appropriate to threaten Plaintiff regarding statutory rape.  While not specifically addressing the
   issue,  Benabente appears to indicate that he believed LiCalsi asking for an investigation was
27 proper.

28                                              7

that LiCalsi did not give Benabente specific directions, based on the evidence of LiCalsi's and

Benabente's "plan," there is a disputed issue of fact on what LiCalsi knew or should have known

what Benabente might do to execute the plan.

During the next several weeks Benabente and LiCalsi had a few brief discussions about

the matter.[7]

Sometime after October 28, 2002, LiCalsi advised Benabente that he was going to be

responsible for a $500 deductible on the repairs to the car.

Benabente was the one who brought up the subject of restitution with LiCalsi on the first

day LiCalsi talked to Benabente.   When Benabente asked if LiCalsi would be willing to accept

restitution, LiCalsi advised that he might consider it.   While Plaintiff disputes this fact,

Plaintiff's evidence only shows that LiCalsi and Benabente both understood the "plan" was for

Benabente to find Plaintiff and obtain his $500.   While Plaintiff's evidence indicates LiCalsi

meant for Benabente to obtain his money, no evidence cited by Plaintiff indicates that it was

originally LiCalsi's and not Benabente's idea.   However, there is evidence on whether by the

time Benabente detained Plaintiff, LiCalsi and Benabente were both in agreement that Benabente

was finding Plaintiff to obtain LiCalsi's $500.

Defendants offer as an undisputed fact that it was LiCalsi's expectation and Benabente's

understanding that LiCalsi expected him to act as a professional peace officer in dealing with the

adverse driver and that in no way was LiCalsi condoning a violation of the adverse driver's

Fourth Amendment rights.   Defendants cite to Benabente's deposition at pages 85 and 134 and

the declaration of LiCalsi.   In opposing this evidence, Plaintiff cites the evidence discussed

above in which Poole and Benabente testified the "plan" was to find Plaintiff and obtain

LiCalsi's $500.   This evidence provides circumstantial evidence that LiCalsi was unconcerned

with Plaintiff's rights so long as he obtained his money back.   Thus, there is a disputed issue of

---

[7] Plaintiff cannot admit or deny this fact.   Because Plaintiff offers no evidence to refute
this fact, it is deemed undisputed.

fact on whether LiCalsi expected and Benabente understanding that LiCalsi wanted Benabente to not violate Plaintiff's constitutional rights.

Benabente began his investigation by going to the area of the incident and trying to develop witnesses. He spoke to the security guard, Liz Torrez, and understood that the adverse driver frequented the school in the company of a young lady. Benabente also tried to locate the registered owner of the vehicle through the use of DMV printouts on the vehicle.   Benabente drove to the address of the registered owner at least three times, but he never found anyone home.

Benabente enlisted the assistance of Madera County District Attorney's Office Criminal Investigator Matthew Markle in attempting to locate the driver of the vehicle at the high school. Benabente and Markle went to the high school on three occasions to locate the vehicle and adverse driver and they located him on the third attempt.

Benabente also talked to Sam Anderson, the Madera City Police Department resource officer for the Madera City schools, about the incident.

On the morning of November 14, 2002, between 7:30 a.m. and 8:00 a.m., Benabente and Matthew Markle, who were in separate vehicles, located the subject 1992 white Mercury Topaz near the high school.   Markle's vehicle was equipped with red and blue emergency lights.

Markle had reasonable suspicion to stop the Mercury Topaz, based upon the fact that the Mercury Topaz had a broken left rear taillight and expired license plate tags.   The parties dispute whether Markle also had reasonable suspicion to make the stop based upon the fact the Mercury Topaz had been reported to have been involved in a hit and run traffic collision.   However, the parties agree that the observed violations would cause a properly trained and experienced peace officer to reasonably believe that the vehicle could be lawfully stopped and that the driver could be temporarily detained.   Plaintiff agrees that he was driving a car with a broken taillight; driving without a license; driving without insurance; that he gave a false name after the accident;

1    and that he did not provide the name of the owner of the car at the time of the accident.

2        Markle identified himself to Plaintiff as a police officer, and let Benabente take over.

3    There was no communication or physical contact between the Plaintiff and Markle.  Benabente

4    and Plaintiff communicated with each other in Spanish and Markle did not understand what they

5    were saying.   Benabente's badge and gun were visible while he talked to the Plaintiff.

6        Plaintiff had no problem understanding Benabente's Spanish and understood that he was

7    stopped because of the expired license plate tags and the broken rear taillight.[8]

8        Plaintiff gave Benabente a false name before showing him his identification card. When

9    Plaintiff provided Benabente with his wallet, Benabente found a Mexican Consulate

10   identification card with the Plaintiff's picture on it with the name of Honorio Quiroz.

11       Plaintiff admitted to Benabente either at the time of the stop or in Benabente's office that

12   he had been involved in the accident and that he had given false information at the accident

13   scene.

14       Plaintiff testified in his deposition that Benabente gave him the choice of going to

15   Benabente's office or being taken to jail, and Plaintiff agreed to go to Benabente's office.[9]

16       The parties dispute whether the fact that Plaintiff was apparently in the United States

17   illegally and was operating the vehicle without a valid driver's license or proof of insurance

18   further supports the reasonableness of the temporary detention.   This legal dispute is addressed

19   below.

20       Benabente contacted Madera City Police Officer Anderson to transport Plaintiff.

21

22

23       [8]  While Plaintiff disputes this fact in part, this fact only concerns Plaintiff's
     understanding as to why he was stopped.  The fact does not address other reasons why Benabente
     may have stopped Plaintiff.  As such, Plaintiff's evidence as to other reasons Benabente stopped

24   Plaintiff do not create a dispute as to why Plaintiff believed he had been stopped.

25       [9]   While Plaintiff disputes this fact, the cited evidence does not refute this undisputed
     fact and fails to raise a triable issue of material fact.   While the cited evidence may offer

26   circumstantial evidence that LiCalsi's motives and directives to Benabente went beyond
     Benabente merely finding out Plaintiff's name, it does not offer any evidence on whether

27   Benabente told Plaintiff he had a choice between going to jail or Benabente's office.

28                                            10

1    Physical contact between Plaintiff and Benabente at the location of the initial stop was

2  limited to Benabente's briefly placing his hand on Plaintiff's back.   Plaintiff testified that Officer

3  Anderson took him by the wrist and directed Plaintiff across the street to Officer Anderson's

4  marked police car for transport to Benabente's office.   Plaintiff was not handcuffed.

5    The entire stop lasted 20 minutes or less.  The location where Plaintiff was stopped is

6  between 4-5 minutes away from the District Attorney's Office.  Officer Anderson then took

7  Plaintiff to the District Attorney's Office.

8    Plaintiff could have been charged with violations of Penal Code Section 148(a) (resisting,

9  delaying or obstructing an officer in the performance of his duties); Vehicle Code Section 12500

10  (driving without a valid driver's license); and Penal Code Section 148.9 (false information of

11  identity to a peace officer) as a result of his conduct at the time of the stop.  Plaintiff's attempt to

12  conceal his identity on November 14, 2002, constituted a separate and distinct illegal act

13  committed in the presence of the officers and exposed Plaintiff to arrest, notwithstanding any of

14  the additional case specific factors.

15    Plaintiff was subject to arrest, incarceration, criminal prosecution, and possibly

16  deportation for a variety of reasons.

17    The parties dispute whether Plaintiff ultimately benefitted from the peace officers'

18  exercise of their discretion to take Plaintiff to a conference at the District Attorney's Office.

19  Because whether Plaintiff "benefitted" is a matter of opinion that appears to only be relevant as

20  to damages, the court does not need to address on this motion whether Plaintiff "benefitted."

21     Benabente arrived at the District Attorney's Office right after Plaintiff.

22    Benabente does not remember touching Plaintiff as they walked across the street.

23  Plaintiff testified in his deposition that Benabente held his left wrist as Plaintiff got out of the car

24  and crossed the street with him, holding onto his wrist until they got to the District Attorney's

25  office building.

26    Markle had no physical contact with Plaintiff.

27

28                                                   11

On November 14, 2002, LiCalsi saw Benabente walking down the hall with a Hispanic man. Within a few minutes Benabente contacted LiCalsi and advised that he had the person who hit LiCalsi's son's car, Honorio Quiroz, in his office.[10] This was the first that LiCalsi was aware that the adverse driver had been located and identified.

The parties dispute whether  LiCalsi directed Benabente to bring Plaintiff to his office. Plaintiff's only evidence of LiCalsi specifically directing Benabente to bring Plaintiff to the District Attorney's office as opposed to merely getting back LiCalsi's $500 is Mr. Markle's hearsay statements in his deposition at pages 26-30.

LiCalsi was advised by Benabente that Plaintiff was there voluntarily and wanted to make restitution of the $500.00 deductible.   While Plaintiff disputes this fact, Plaintiff offers no evidence contradicting LiCalsi's declaration that this is what Benabente told him.   However, in considering whether Plaintiff really was at the District Attorney's office voluntarily and whether LiCalsi truly believed Plaintiff was there voluntarily, the court will consider the fact that there is evidence LiCalsi and Benabente planned and intended for Benabente to find Plaintiff and obtain LiCalsi's $500.  See Poole Depo. at 346-48; Benabente Depo. at 97-98 & 116-18.  Once LiCalsi arrived, Benabente introduced LiCalsi as his boss; and explained to LiCalsi that Plaintiff offered to pay the deductible on the car.   While Plaintiff disputes this evidence, Plaintiff cites no evidence refuting that this is what Benabente said.   In considering whether Plaintiff really did "offer" on his own initiative to pay the deductible the court will consider the fact that there is evidence LiCalsi and Benabente planned and intended for Benabente to find Plaintiff and obtain LiCalsi's $500.  See Poole Depo. at 346-48; Benabente Depo. at 97-98 & 116-18

When LiCalsi entered Benabente's office, Plaintiff was not handcuffed and was sitting by himself.   LiCalsi states that Plaintiff appeared to LiCalsi to be there voluntarily. The door to Benabente's office remained open the entire time that LiCalsi was present.

---

[10] Plaintiff cannot admit or deny this fact.   Because Plaintiff offers no evidence to refute this fact, it is deemed undisputed.

1    At no time did LiCalsi have any physical contact with Plaintiff.   LiCalsi did not search

2    Plaintiff.   The parties dispute whether LiCalsi directed others to take these actions.   Plaintiff's

3    only evidence that LiCalsi directed others to have physical contact with Plaintiff and search

4    Plaintiff is Markle's deposition at pages 26 through 30, when Markle testifies that Benabente told

5    him that LiCalsi had told Benabente to stop Plaintiff and bring him to the District Attorney's

6    office.   It is unnecessary to resolve the admissibility of Markle's testimony because no claim for

7    excessive force is before the court.

8    LiCalsi personally made no threats of criminal prosecution or deportation to Plaintiff.

9    The parties dispute whether LiCalsi directed Benabente or anyone else to make these threats.

10   Defendants cite to Benabente's deposition in which Benabente states that no threats of criminal

11   prosecution were brought up while Plaintiff, LiCalsi, and Benabente were talking.   See

12   Benabente Depo. at 153.   Defendants also cite to LiCalsi's declaration.   See LiCalsi Dec. at ¶

13   15.   In response, Plaintiff provides the testimony of Poole confirming that LiCalsi told him he

14   would have Benabente find Plaintiff and obtain his $500.   See Poole Depo. at 347-48.   Plaintiff

15   also provides the deposition of Benabente, in which Benabente describes the "plan" to obtain

16   LiCalsi's $500.   See Benabente Depo. at 156-57.   Based on this evidence, the court finds the

17   undisputed evidence reveals that Benabente made no threats to Plaintiff in LiCalsi's presence,

18   but there is a disputed issue of fact on whether Benabente told Plaintiff at LiCalsi's direction that

19   he could avoid prosecution and deportation if he paid the $500 deductible.

20   Plaintiff did not understand what Benabente and LiCalsi were saying to each other when

21   they spoke in English.   LiCalsi did not understand what Benabente and Plaintiff said to each

22   other when they spoke in Spanish.   LiCalsi depended upon Benabente's interpretation of

23   Benabente's conversation with Plaintiff.[11]

24   Benabente informed LiCalsi that Plaintiff had offered to pay the deductible to him and

25

26   _____

27   [11]  Plaintiff cannot admit or deny this fact.   Because Plaintiff offers no evidence to refute
this fact, it is deemed undisputed.

28                                                    13

that Plaintiff had informed Benabente that he had $200.00 with him.[12]   It was agreed that Plaintiff would pay the balance in two weeks.

LiCalsi agreed to resolve the criminal hit and run matter because Plaintiff had agreed to make restitution.   The parties dispute whether LiCalsi ever said that in exchange for the payment of the insurance deductible he would not pursue prosecution of Plaintiff.   Defendants cite to the declaration of LiCalsi at Paragraphs 9 and 10.   The testimony of Benabente cited by Defendants does not confirm that LiCalsi never stated he would not pursue prosecution in exchange for the $500.   The testimony of Benabente regarding a "plan" to obtain LiCalsi's $500 provides circumstantial evidence that LiCalsi was always willing to not prosecute Plaintiff in exchange for the $500.   See Benabente Depo. at 97-98;156-57

The parties dispute whether it was appropriate for LiCalsi, as the District Attorney, to exercise his discretion on whether to file a criminal case.   Defendants provide the opinion of District Attorney John R. Poyner, who states LiCalsi's actions were appropriate.   Plaintiff provides the deposition of Poole, stating that he did not think it was a good idea to use Benabente to find Plaintiff to obtain LiCalsi's $500.   See Poole Depo. at 346-48.

Plaintiff made a $200.00 payment in Benabente's office.   Plaintiff believed that he owed the $500.00 to LiCalsi.[13]

Benabente prepared and signed a receipt for the $200.00 payment made by Plaintiff, photocopied it, along with Plaintiff's identification card, and handed the original receipt and identification card to Plaintiff.

After an agreement was reached, the money was handed over to LiCalsi.

LiCalsi then asked Benabente to advise Plaintiff of the statutory rape laws.   While Plaintiff disputes this evidence, the cited evidence does not contradict Defendants' evidence that

---

[12]  Plaintiff cannot admit or deny this fact.   Because Plaintiff offers no evidence to refute this fact, it is deemed undisputed.

[13]  While Plaintiff disputes this fact, the cited testimony does not refute Plaintiff's admission at his deposition that he believed he owed $500.00 to LiCalsi.

the issue of statutory rape was not brought up until after Plaintiff agreed to paying the money.

Benabente did testify that in his opinion LiCalsi threatened Plaintiff.   Benabente believed it was

inappropriate to bring up statutory rape because there was no evidence of statutory rape and the

only reason to do so would be to "keep pressure on the guy."   See Benabente Depo. at 156-57.

While Defendants cite LiCalsi's deposition that he only brought up statutory rape because he

understood from Benabente that Adrianna Hernandez, age 14, was Plaintiff's girlfriend, LiCalsi's

motive is disputed because Benabente's testimony provides another possible motive.   The

appropriateness of LiCalsi's actions is also disputed.

Benabente informed Plaintiff that it is against the law to have sexual intercourse with a 15

year old girl.

LiCalsi left immediately thereafter.

After LiCalsi had left Benabente's office, Benabente also took a Polaroid photo of

Plaintiff for further evidence of who he was dealing with.   Benabente also gave Plaintiff the

impression that he took his fingerprints, by asking him to place his hands on a white piece of

paper.

LiCalsi did not specifically ask Benabente to take Plaintiff's photograph or to cause

Plaintiff to believe that Benabente had taken his fingerprints.   LiCalsi had already left

Benabente's office when this was done.[14]

The parties dispute whether Benabente understood that LiCalsi expected that Benabente

would honor Plaintiff's rights.   Defendants' cite Benabente's deposition in which Benabente was

asked whether he understood that LiCalsi expected he would honor Plaintiff's rights and

Benabente agreed.   See Benabente Depo. at 176.   In opposition, Plaintiff cites to Poole's and

Benabente's testimony in which they talked about LiCalsi's and Benabente's "plan" to obtain

LiCalsi's $500 from Plaintiff.   Given that there is evidence of a plan to obtain the money and the

---

[14]  Plaintiff cannot admit or deny this fact.   Because Plaintiff offers no evidence to refute this fact, it is deemed undisputed.

1  facts of what Benabente actually did, the court finds a circumstantial inference can be made that

2  Benabente believed Plaintiff's rights were not LiCalsi's upmost concern.

3       Benabente and Plaintiff had been at the District Attorney's office for between 30 and 45

4  minutes, prior to Plaintiff leaving.

5       District Attorney conferences are not unusual and serve the administration of justice.

6  The parties dispute whether this conference ultimately benefitted Plaintiff.  Defendants' offer

7  their expert's opinion that this conference ultimately benefitted Plaintiff.   Defendants offer their

8  expert's opinion that there were no procedural defects in the handling of this matter by LiCalsi.

9  As these are opinions that appear to go to damages, these facts will not be considered undisputed

10  facts.

11      Plaintiff came to Benabente's office on November 27, 2002, and paid the additional

12  $300.00 of the agreed $500.00 restitution.   Plaintiff and Benabente were together in Benabente's

13  office for 15 to 20 minutes.  Benabente made copies of the money and a receipt and gave

14  Plaintiff the original receipt.  They shook hands when Plaintiff left.

15      At all the times relevant to this action, the Madera County District Attorney's Office

16  required that its District Attorney Investigators be P.O.S.T. certified peace officers to assure that

17  the investigators have gone through a police academy and received instruction on the rights of

18  criminal suspects, including their Fourth Amendment right to be free from unlawful search and

19  seizure.

20      P.O.S.T. (Peace Officer Standards and Training) is the Commission that regulates peace

21  officer standards and training for officers employed within the

22  State of California.

23      In November 2002, the Madera County District Attorney's Office was in compliance with

24  P.O.S.T. training requirements for its District Attorney investigators.[15]

25

26

27      [15]  Plaintiff cannot admit or deny this fact.   Because Plaintiff offers no evidence to refute
    this fact, it is deemed undisputed.

28                                          16

Benabente attended the police academy in Modesto in 1984 and received a POST certificate.   He has been POST certified ever since.

Benabente worked as a police officer for the City of Madera from 1986 to 1997, working patrol for two years and as a detective for 4 years.

District Attorney Investigator Matthew Markle attended the police academy at Fresno City College in 1971 or 1972 and worked for the Madera Sheriff's Office until he retired due to an injury in 1986 or 1987.  Markle obtained a private investigator's license and worked as a private investigator for 9 years, starting in 1991.  Markle returned to the police academy and became re-certified in P.O.S.T. training requirements, working as a reserve officer for Fowler Police Department in patrol, school resource functions and conducting background investigations. In 1999 he became a Madera County District Attorney's Office criminal investigator.

By virtue of their P.O.S.T. certification status the District Attorney Investigators had undergone the testing, training, and qualifications associated with their employment; including training on the constitutional rights of citizens and criminal suspects.  In these matters, the standards for the selection, hiring, training and supervision of the Peace Officers are mandated by the California P.O.S.T. Commission.

Defendants offer as an undisputed fact that there has been no policy or practice in the Madera District Attorney's Office for prosecution for monetary gain or civil advantage.  While Plaintiff is unable to offer evidence of a policy and practice, one of Plaintiffs' theories of a policy and practice is that LiCalsi, as the District Attorney, made the Madera District Attorney's Office's policy and practice as its final decision maker.

In general, Plaintiff lacks expert evidence showing that the polices and practices of the Madera County District Attorney's Office are not appropriate.

It was and is expected that the County of Madera District Attorney Investigators conduct themselves in accordance with the law.

**DISPUTED FACTS**

Plaintiff offers evidence that LiCalsi told Poole that he was going to use Benabente to find the person who was involved in the accident with his son's car and have Benabente get his deductible back.

In general, the Madera County District Attorney's Office does not investigate non-injury traffic accidents and that it would be unusual to do so.

The general policy of the Madera County District Attorney's Office is to conflict out of any matter which an employee is personally involved.   Terry Ginder, who testified to this policy, could not recall any specific cases where that was done.

Customarily, investigations are assigned case numbers.   However, there are some matters which were investigated without assigned District Attorney numbers.

At the time LiCalsi went to Poole, in his mind he believed that the prosecution of Plaintiff would be a conflict of interest for him and his office.

The parties dispute whether LiCalsi threatened Plaintiff in Benabente's office with prosecution and charges if Plaintiff did not pay the $500.  In his office, Benabente told Quiroz that he had committed violations of the law.   Benabente testified that while acting as LiCalsi's interpreter he told Plaintiff that if restitution was not made, there could be an arrest, charges, and prosecution.  See Benabente Depo. at 120-21. After Plaintiff agreed to pay the $500, Benabente also told Plaintiff it was a crime to have sex with a 15 year old and mentioned deportation.  See id. at 123-25, 156-57.   Benabente then testified that LiCalsi told him it was up to him about whether Benabente should pursue the charges that arose when Benabente stopped Plaintiff. Benabente testified that it was an understanding that Benabente would do nothing because if Benabente did something, LiCalsi may not have received his money.  See Benabente Depo. at 97-98, 116-17.  Benabente admitted that he did not pursue the criminal charges because he did not want to interfere with the agreement between Plaintiff and LiCalsi.   See id.  From Benabente's statements to Plaintiff about Plaintiff's crimes and Benabente's decision to do nothing once

18

1   Plaintiff agreed to pay the $500, an inference can be made that Benabente threatened Plaintiff

2   with criminal prosecution if he did not pay the $500.   In response, Defendants cite to LiCalsi's

3   declaration in which LiCalsi contends that no threats were made by or at the direction of LiCalsi

4   prior to reaching the agreement.   Based on the evidence of the LiCalsi's and Benabente's "plan",

5   the court finds a disputed issue of fact on whether Plaintiff was threatened with charges if

6   Plaintiff did not pay the $500.

7          The parties dispute whether there was a reasonable basis for comments regarding criminal

8   prosecution for statutory rape.   While LiCalsi claims he understood a 14 year old was Plaintiff's

9   girlfriend from Benabente, as discussed above, Benabente was not comfortable bringing up the

10  statutory rape because there was insufficient evidence.

11         Plaintiff offers as a disputed fact that when the allegation of wrongdoing by LiCalsi arose,

12  LiCalsi went to Benabente and told him the "attorneys had wanted us to get our stories straight."

13  See Benabente Depo II at 110-11.

14         At the time LiCalsi first sent Benabente to find Plaintiff, no D.A. number was assigned

15  and no D.A. number was ever assigned to this investigation.

16         Plaintiff offers evidence that Benabente was investigating the automobile accident for

17  LiCalsi personally.   See Benabente Depo. II at 45-46.

18         Plaintiff offers evidence that Benabente on other occasions had talked to people on

19  LiCalsi's behalf.  Benabente spoke to someone who was a contractor for LiCalsi's son's baseball

20  coach; Benabente spoke to the wife of LiCalsi's neighbor; Benabente spoke to individuals

21  regarding a car dealership dispute involving LiCalsi's friend.   See Benabente Depo. II at 48-49,

22  51-59, 65-68.   Benabente stated that he would resolve things at LiCalsi's request without going

23  through "the system" and sometimes they were done for LiCalsi's friends.   See id. at 49-50.   In

24  some cases, Benabente told people that if they did not pay money or solve a problem, charges

25  would be filed.   See id. at 64.

26         When Benabente told LiCalsi "there is a chance I am going to get this guy today," LiCalsi

27

28                                                    19

responded "Call me.  Page me, if you get him."   <u>See</u> Benabente Depo. II at 78-79.

When Plaintiff was stopped, Benabente told him about the $500.   When Plaintiff asked if he could take care of it tomorrow, Benabente told him he better take care of it today.   <u>See</u> Benabente Depo. II at 90.

Plaintiff provides evidence that LiCalsi is the final decision maker of the Madera County District Attorney's Office.   Terry Ginder testified that LiCalsi had the ability to make final rules for the District Attorney's Office.   <u>See</u> Ginder Depo. at 34.   Mr. Ginder believed that the County of Madera could not override a decision by LiCalsi.   <u>See</u> <u>id</u>. at 35.   Defendants object to Plaintiff's evidence from Terry Ginder.   At the hearing, Plaintiff stated that Ginder is a District Attorney Investigator.

**DISCUSSION**

At the hearing, Plaintiff clarified that the basis of Plaintiff's 42 U.S.C. § 1983 claim. Plaintiff has three basic contentions.  First, Plaintiff contends that LiCalsi violated Plaintiff's Fourth Amendment rights.  Second, Plaintiff contends that LiCalsi violated Plaintiff's substantive due process rights.  Third, Plaintiff contends that the County of Madera is liable for LiCalsi's actions under a <u>Monell</u> theory of liability.   Defendants contend that they are entitled to summary judgment on all claims before the court.

**A.  Defendant LiCalsi**

_____Defendants request summary judgment in favor of LiCalsi on all claims against LiCalsi in his individual and official capacity.

***1.  Fourth Amendment***

Plaintiff contends that LiCalsi violated his Fourth Amendment rights.   Defendants contend that they are entitled to summary judgment because there was reasonable Benabente and Markle had reasonable suspicion to stop Plaintiff.    At the hearing Plaintiff clarified that it is not his position that Benabente's and Markle's traffic stop violated Plaintiff's Fourth Amendment rights.   Rather, Plaintiff contends that when Benabente took Plaintiff to the District Attorney's

1  Office and when LiCalsi and Benabente threatened Plaintiff in Benabente's office, their actions

2  were not directed at the lawful vehicle stop.    Plaintiff argues that regardless of whether

3  Benabente's original detention of Plaintiff was lawful, the conversation with LiCalsi, Benabente,

4  and Plaintiff in Benabente's office violated Plaintiff's Fourth Amendment rights.    Defendants'

5  position is that the original stop was a lawful investigatory stop and Plaintiff voluntarily went to

6  Benabente's office and voluntarily stayed in the office while he talked to Benabente and LiCalsi.

7

8         In general, police may stop and question a person without any suspicion that he is

9  engaged in wrongdoing so long as the person feels free to disregard the police and go about his

10  business. Florida v. Bostick, 501 U.S. 429.    If, however, police "seize" a person for a brief,

11  investigatory stop it must be supported by reasonable suspicion.   Terry v. Ohio, 392 U.S. 1,

12  20-22 (1968).   If a seizure turns into a full blown arrest, it must be supported by probable cause.

13  Pierson v. Ray, 386 U.S. 547, 555-558 (1967).  In determining whether an investigative detention

14  ripens into an arrest, the court must evaluate the totality of the circumstances.  Eberle v. City of

15  Anaheim, 901 F.2d 814, 819 (9th Cir.1990).  In evaluating whether an investigative detention is

16  unreasonable, "common sense and ordinary human experience must govern over rigid criteria."

17  United States v. Sharpe, 470 U.S. 675, 685  (1985).

18         The parties agree that Benabente's and Markle's traffic stop was lawful.   However, the

19  lawfulness of the original stop does not absolve Benabente and LiCalsi from committing a Fourth

20  Amendment violation.   "A seizure becomes unlawful when it is more intrusive than necessary."

21  Ganwich v. Knapp, 319 F.3d 1115, 1122 (9th Cir.2003).   In addition, a valid investigatory stop

22  must be temporary, based upon reasonable suspicion, and last no longer than necessary to

23  effectuate the purpose of the stop.  Florida v. Royer, 460 U.S. 491, 500 (1983).

24  Detentions or searches that are prolonged or otherwise unreasonable in view of the reason for the

25  stop also are unlawful under the Fourth Amendment. See, e.g., United States v. Foppe, 993 F.2d

26  1444 (9th Cir.1993) (describing as a violation of the Fourth Amendment an officer's search of a

27

28                                              21

1   motorist unrelated to the traffic violation that originally justified the stop of the motorist's

2   vehicle).  Similarly, the investigative methods employed should be the least intrusive means

3   reasonably available to verify or dispel the officer's suspicion in a short period of time.  Royer,

4   460 U.S. at 500.

5          The parties agree that Benabente had at least a reasonable suspicion to stop Plaintiff and

6   detain him when Benabente stopped Plaintiff for the traffic violations.   While it is not clear how

7   long Benabente questioned Plaintiff on the street, Plaintiff does not allege that the duration of the

8   questioning was improper.    Plaintiff also does not allege it was improper for Benabente to bring

9   up the car accident during this stop.   There is evidence that when Plaintiff told Benabente he

10  would take care of what he owed for the car accident the next day, Benabente told him he needed

11  to take car of it "today."    Benabente told Plaintiff he could either come with him or be arrested.

12  Thus, the issue is whether there is a disputed issue of material fact on if Plaintiff's Fourth

13  Amendment rights were violated when Plaintiff and Benabente went to Benabente's office and

14  Plaintiff, Benabente, and LiCalsi discussed the $500 and other issues.   To determine if Plaintiff's

15  Fourth Amendment rights were violated, the court must consider whether there is a disputed

16  issue of fact on whether Plaintiff went voluntarily and/or whether it was part of a reasonable

17  investigative detention.

18  *a.  Voluntary Conversation*

19          Defendants contend that Plaintiff was not seized and Plaintiff voluntarily accompanied

20  Benabente to his office.   A "seizure" occurs only when an officer restrains the liberty of an

21  individual, either by means of physical force or show of authority.  Terry, 392 U.S. at 19 n.16.   If

22  Plaintiff went voluntarily with Benabente and stayed in Benabente's office voluntarily, there was

23  no Fourth Amendment violation.

24          A police officer does not "seize" a person simply by approaching him and asking him

25  questions.  Florida v. Bostick, 501 U.S. 429, 434 (1991).  "A seizure of the person within the

26  meaning of the Fourth and Fourteenth Amendments occurs when, taking into account all of the

27

28                                              22

circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." Kaupp v. Texas, 538 U.S. 626, 629 (2003) (internal quotations omitted).   An encounter between an officer or other government official and an individual "will not trigger Fourth Amendment scrutiny unless it loses its consensual nature." Bostick, 501 U.S. at 434. Though an individual need not be arrested in order for a seizure of the person to have occurred, the restraint on liberty typically must be effected by physical force or a show of lawful authority. California v. Hodari D., 499 U.S. 621, 626-27 (1991); see also Terry, 392 U.S. at 19 ("Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred").   The essential inquiry is whether the plaintiff reasonably believed that he or she was not free to leave. Morgan v. Woessner, 997 F.2d 1244, 1253 (9th Cir.1993); United States v. Low, 887 F.2d 232, 234 (9th Cir.1989).   Voluntariness is a question of fact determined from all of the surrounding circumstances.   United States v. Mendenhall, 446 U.S. 544, 557 (1980); Arias-Villanueva, 998 F.2d at 1501.   The test of whether a person felt free to disregard police requests is an objective standard.   People of the Territory of Guam v. Palomo, 35 F.3d 368, 375 (9th Cir. 1994).

Defendants admit that the original detention of Plaintiff on the street, after the traffic stop, was not voluntary.   Rather, Defendants contend Plaintiff voluntarily went to Benabente's office and voluntarily stayed there to discuss the accident with Benabente and LiCalsi.   The encounter between Plaintiff and Benabente originally took place on the street, which provided access for Plaintiff to walk away.   Benabente identified himself, never drew a weapon, and did not handcuff Plaintiff.   However, Benabente never told Plaintiff that he did not need to come with Benabente to his office.   These facts provide an indication Plaintiff's actions were voluntary. However, neither Benabente nor LiCalsi ever told Plaintiff he was free to leave Benabente's office.   Neither Benabente nor LiCalsi ever told Plaintiff that he did not need to discuss the hit and run with Benabente.   Neither Benabente nor LiCalsi ever told Plaintiff that he was not

under arrest.   In fact, there is evidence that Benabente told Plaintiff that if he did not come to Benabente's office he would be placed under arrest.   When Plaintiff indicated that he would take care of the money he owed LiCalsi the next day, Benabente told him he needed to take care of it then.   Based on the facts before the court, there are facts from which a jury could find that a reasonable person would not believe they had any ability to end the conversation with Benabente, not accompany Benabente to his office, and not stay in the office until Benabente indicated he could leave.   There is a disputed issue of fact on whether Plaintiff had an objective reason to believe he was not free to end the conversation and leave.

No party has cited any cases regarding voluntarily accompanying officers for further questioning.   In this case, at this time, the burden is on Defendants to come forward with cases indicating that telling a person they can either be arrested or come with the officer for further discussions does not render a person's accompanying the officer involuntary.   Cases from other circuits have indicated that threatening to obtain a search warrant or arrest a person if consent is withheld makes consent involuntarily.   United States v. Briley,  726 F.2d 1301, 1305 (8th Cir. 1984); United States v. Boukater, 409 F.2d 537, 538 (5th Cir.1969).   In addition, the Sixth Circuit has found that telling a couple they "needed to go" to police station and court, then back to police station where they would be booked, amounted to an arrest.   Gardenhire v. Schubert, 205 F.3d 303, 314 (6th Cir. 2000).   Here, a reasonable jury could conclude that Plaintiff did not voluntarily accompany Benabente to his office and did not voluntarily stay there in light of the evidence that Plaintiff was told he would be arrested if he did not go with Benabente and Benabente's refusal when Plaintiff asked if he could pay the money he owed the next day.   Thus, summary judgment is not appropriate on the ground that there was no Fourth Amendment violation because Plaintiff voluntarily went to Benabente's office and stayed there.   There is a disputed issue of fact on whether Plaintiff voluntarily accompanied Benabente.

*b.  Investigatory Detention*

In the event the court finds a disputed issue of fact on whether Plaintiff voluntarily went

with Benabente, Defendants contend that Plaintiff's Fourth Amendment claim is not viable

because the entire detention of Plaintiff was an valid investigatory detention.   Once Plaintiff and

Benabente left to go to Benabente's office, a disputed issue of fact arises on whether Plaintiff had

been seized.

   Normally, forcibly moving a person from the place where he was originally detained turns

an investigatory stop into a de facto arrest.   The Supreme Court has indicated its view that the

line between detention and arrest is crossed when the police, without probable cause or a warrant,

forcibly remove a person from his home and transport him to the police station, where he is

detained even briefly for investigative purposes.   Hayes v. Florida, 470 U.S. 811, 816 (1985).

The Ninth Circuit likewise has held that, although there is no bright line for determining when an

investigatory stop becomes an arrest, "a distinction may be drawn at the point of transporting the

defendant to the police station."   United States v. Parr, 843 F.2d 1228, 1231 (9th Cir.1988); see

also, e.g., Dunaway v. New York, 442 U.S. 200 (1979) (arrest occurs when suspect is seized and

transported to the police station for interrogation); United States v. Hernandez, 825 F.2d 846, 851

(5th Cir.1987) (removal of suspect from scene of the stop to police headquarters usually marks the

point at which the investigative stop becomes a de facto arrest); Gonzales v. City of Peoria, 722

F.2d 468, 477 (9th Cir.1983) (defendant is arrested when transported to police station and placed

in cell or interrogation room even if the purpose is investigatory rather than accusatory).

   Defendants contend that moving Plaintiff did not turn the investigative stop into an arrest

and seizure.   Defendants cite to Gallegos v. City of Los Angeles, 308 F.3d 987 (9th Cir. 2002).

In Gallegos, the plaintiff was misidentified as the suspect in a possible break-in.   Id. at  989.

The plaintiff was, in fact, visiting his daughter, who lived across the street.   Id.   He was stopped

by the police a few miles away, and he was ordered from his truck at gunpoint, handcuffed, and

placed in the back of the police car.   Id.   Despite his cooperation, the police did not try to

identify him.   He was then brought back to the scene, where a neighbor confirmed he was not

the man who had tried to break into the house.   Id.   It was approximately 45 minutes to one hour

25

before the plaintiff was returned to his vehicle and released.  Id.  The plaintiff sued under

Section 1983, and on appeal from a grant of summary judgment in favor of defendants, the Ninth

Circuit affirmed.  Id. at 993.  The Ninth Circuit reasoned that:

> The whole point of an investigatory stop, as the name suggests, is to allow police
> to *investigate,* in this case to make sure that they have the right person. For police
> to draw their guns in ordering Gallegos from the truck, when unsure if he was
> armed; for police to handcuff Gallegos in the back of a[ ] patrol car, when unsure
> of who he was; and for police to bring him back to Melbourne Ave.--this was not,
> under the circumstances, an unreasonable way of finding out if Gallegos was the
> person they were looking for.

Id. at 991.

Recently, in United States v. Charley, 396 F.3d 1074 (9th Cir. 2005), the Ninth Circuit

again found moving a Defendant did not turn an investigatory detention into an arrest.  In

Charley, the defendant Charley shot three of her six children to death with a .22 caliber semi-

automatic rifle.  Id. at 1077.  Charley called police and went to the home of relatives.  Id.  When

the police arrived, Charley was upset and told police she had done something bad.  Id.  A

sergeant told Charley that she was not under arrest and he needed to take her to her house to find

out what's going on.  Id.  Charley told the sergeant that "You're going to have to take me away

for a long time."  Id.  The sergeant placed Charley in the patrol car and she gave him directions

to her house.  Id.  When the sergeant asked for permission to enter Charley's house, Charley told

him yes and urged him to hurry because the children were inside.  Id.  After finding the children

inside the sergeant secured the scene, and proceeded to question Charley as she sat in his patrol

car after giving her Miranda warnings.  Id. at 1077-78.  At her criminal trial, Charley argued

that she was seized when the sergeant took her back to her house.

Citing Gallegos, the Ninth Circuit stated that "we have held that the police may move a

suspect without exceeding the bounds of an investigative detention when it is a reasonable means

of achieving the legitimate goals of the detention 'given the specific circumstances' of the case."

Charley, 396 F.3d at 1080 (quoting Gallegos, 308 F.3d at 991).  The Ninth Circuit found that it

was reasonable for the Sergeant to detain Charley in his car for investigative purposes as he drove to her home to determine why she had called dispatch and the reason for her distress.   Id. The Ninth Circuit also noted that Charley not only voluntarily accompanied the sergeant to her home, but that she repeatedly insisted that they go there to check on her children.   Id.  at 1081.

There is no bright line test for determining when an investigatory detention becomes an arrest.   United States v. Sharpe, 470 U.S. 675, 685 (1985); United States v. Torres-Sanchez, 83 F.3d 1123, 1127 (9th Cir. 1996).  This much is clear: A brief stop and patdown of someone suspected of criminal activity is merely an investigative detention requiring no more than a reasonable suspicion. Terry, 392 U.S. at  6-7.  But removing a 17-year-old youth from his bed at 3 a.m. and transporting him in handcuffs by patrol car to the police station for questioning has been held to be unreasonable absent probable cause to believe that the youth has committed a crime.  Kaupp v. Texas, 538 U.S. 626, 630 (2003).   In the Supreme Court's view, "involuntary transport to a police station for questioning is 'sufficiently like arres[t] to invoke the traditional rule that arrests may constitutionally be made only on probable cause.'" Id.  However, it still may be possible to move an individual when the police are diligently pursuing an investigation that is likely to confirm or to dispel their suspicions of the individual quickly.  Halvorsen v. Baird, 146 F.3d 680, 684-85 (9th Cir.1998) (upholding jury finding that investigative stop did not become an arrest where Section 1983 plaintiff was cuffed and taken from his home to a nearby gas station for questioning and then involuntarily committed in a detoxification facility overnight because jury could conclude that police had determined that it was hard to talk or unsafe to remain in the original location).

In this case, the undisputed facts do not reveal that Plaintiff was moved to effectuate the purpose of the original stop.   The original stop was made because of traffic violations. Defendants' own evidence reveals Plaintiff was taken to Benabente's office to discuss the hit and run, not the traffic violations.   Thus, moving Plaintiff was not necessary to dispel Defendants' suspicions of Plaintiff's possible traffic violations.

1    In addition, there is a disputed issue of fact on whether moving Plaintiff was necessary for

2    an investigative detention on the hit and run.   By the time that Plaintiff left the scene of the

3    original stop, the investigation into the hit and run was essentially over.   Plaintiff had admitted

4    he was responsible for the accident and agreed to pay the $500.   Based on Defendants' own

5    position, the reason for taking Plaintiff to Benabente's office was to discuss an informal

6    resolution instead of charges.   It was no longer necessary to detain or move Plaintiff to

7    investigate whether he was responsible for the hit and run.   This is not a case where Plaintiff

8    was uncooperative, the stop closely followed a violent crime, or the officers had information that

9    the suspect was armed, allowing police officers to use intrusive means to effectuate a stop.   See

10   Washington, 98 F.3d at 1189.   On the record before the court, the court finds that moving

11   Plaintiff raises a disputed issues of fact regarding the reasonableness of an investigative detention

12   under the Fourth Amendment.   The court, therefore, cannot determine at this stage whether the

13   conduct of the officers in this case converted the Terry stop to an arrest.   Accordingly,

14   Defendants are not entitled to summary judgment on the theory that taking Plaintiff to

15   Benabente's office and the time in Benabente's office did not violate the Fourth Amendment

16   because it was part of an investigatory detention.

17   *c.  Liability of LiCalsi as a Supervisor*

18   If the court finds a disputed issue of material fact on whether a Fourth Amendment

19   violation occurred, Defendants contend that LiCalsi is entitled to summary judgment because

20   LiCalsi cannot be held liable for Benabente's possible Fourth Amendemnt violations.

21   Defendants cite to LiCalsi's declaration in which he states that he did not know Benabente was

22   going to bring Plaintiff to his office, he did not keep Plaintiff from leaving the office, and it

23   appeared to him that Plaintiff was free to leave at any time.

24   Generally, there is no respondeat superior liability under Section 1983. Jones v. Williams,

25   297 F.3d 930, 934 (9th Cir.2002).   To show a supervisor's liability, the plaintiff must show (1) the

26   supervisor's personal involvement in the constitutional deprivation, or (2) a sufficient causal

27

28                                          28

connection between the supervisor's wrongful conduct and the constitutional violation.   Jeffers v. Gomez, 267 F.3d 895, 915 (9th Cir.2001).   Supervisors can be held liable if they play an affirmative part in the alleged deprivation of constitutional rights by setting in motion a series of acts by others which the supervisor knew or reasonably should have known would cause others to inflict the constitutional injury.   Graves v. City of Coeur D'Alene, 339 F.3d 828, 848 (9th Cir.2003) (citations omitted) (quoting Rise v. Oregon, 59 F.3d 1556, 1563 (9th Cir.1995); Larez v. City of LA, 946 F.2d 630, 646 (9th Cir.1991)).   "Supervisory liability is imposed against a supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates, for his acquiescence in the constitutional deprivations of which the complaint is made, or for conduct that showed a reckless or callous indifference to the rights of others."   Menotti v. City of Seattle,  409 F.3d 1113, 1149 (9th Cir. 2005) (quoting Larez v. City of Los Angeles, 946 F.2d 630, 646 (9th Cir.1991)).

The undisputed evidence shows that Benabente worked for LiCalsi.   There is evidence that LiCalsi and Benabente devised a plan to use Benabente to find Plaintiff and obtain $500 that LiCalsi had to pay to repair the damage Plaintiff had done to the car.    LiCalsi discussed this plan with Daniel Poole and Benabente.   There is evidence that this matter was investigated in an untypical way because it was never given an internal D.A. number and no reports were ever written.   There is evidence that Benabente believed he was doing this matter for LiCalsi personally.   The evidence before the court indicates that after discussing the plan, Benabente went about his investigation without specific impute from LiCalsi on how to proceed.    There is evidence that when Benabente told LiCalsi there was a chance he would get the guy today, LiCalsi told Benabnete to call if Benabente found Plaintiff.

Defendants take the position that, assuming Benabente committed a Fourth Amendment violation, LiCalsi cannot be held responsible.  Based on the evidence submitted by the parties, there is a disputed issue of materal fact on whether there is a sufficient causal connection between LiCalsi's and Benabente's "plan" to obtain LiCalsi's money and the constitutional

violation.   By directing Benabente to find Plaintiff and obtain LiCalsi's money and implying that
this investigation was not an official investigation of the District Attorney's office but was being
done for LiCalsi personally, a jury could find that LiCalsi set in motion a series of acts by
Benabente that LiCalsi knew or should have known would cause Benabente to violate Plaintiff's
Fourth Amendment rights.

The implication that LiCalsi should have known he had set in motion a series of events
that would end up with violations of Plaintiff's constitutional rights is bolstered by the evidence
of other times LiCalsi directed Benabente to informally resolve the problems of LiCalsi's friends.
LiCalsi takes the position that he had no reason to believe Benabente would violate Plaintiff's
constructional rights and he always believed that Benabente would not violate Plaintiff's
constitutional rights.   In light of the other incidents, Benabente's possible Fourth Amendment
violations cannot be chalked up to a simple misunderstanding between Benabente and LiCalsi
about what LiCalsi wanted.   There is evidence of a pattern by LiCalsi of using Benabente to
informally discuss potential charges with individuals if the individuals did not take certain
actions.

Finally, if the court considers Anderson's double hearsay statement discussed above, the
evidence of LiCalsi setting in motion a series of events that resulted in a violation of Plaintiff's
rights is even stronger.  Plaintiff has provided evidence that Benabente told Anderson that
LiCalsi had told him to bring Plaintiff to the District Attorney's office.  This is evidence of
LiCalsi's personal involvement and directions to Benabente.  A reasonable jury could find that by
telling Benabente to bring Plaintiff to the office, he wanted Benabente to bring Plaintiff there
regardless of whether Plaintiff wanted to come voluntarily.   If Anderson's statement is
admissible, this is additional evidence that LiCalsi implied Benabente should bring Plaintiff to
the office even if it violated Plaintiff's Fourth Amendment rights.   There is no evidence LiCalsi
conditioned his statements by saying Benabente should bring Plaintiff to come talk to him if
Plaintiff was willing to come and discuss the matter informally.   Thus, Anderson's evidence, if

admissible, provides further evidence showing a disputed issue of fact on whether LiCalsi directed Benabente to violate the Fourth Amendment and/or LiCalsi should have known his actions could cause Benabente to violate the Fourth Amendment.   Regardless of whether the court considers Anderson's evidence, the court cannot find LiCalsi is absolved of liability because the possible Fourth Amendment violations were done by Benabente.

### d.  Liability of LiCalsi for His Own Actions

A supervisor can be liable for his own deprivation of constitutional rights.   One theory of LiCalsi's liability is that he became responsible for the alleged Fourth Amendment violation when he walked into Benabente's office.

A supervisor can be liable for failing to stop a constitutional violation that occurs in his or her presence.   See, e.g., United States v. Koon, 34 F.3d 1416, 1447 n. 25 (9th Cir.1994), judgment affirmed in part and reversed in part on sentencing issues, 518 U.S. 81 (1996) ("[A]n officer who failed to intercede when his colleagues were depriving a victim of his Fourth Amendment right to be free from unreasonable force in the course of an arrest would, like his colleagues, be responsible for subjecting the victim to a deprivation of his Fourth Amendment rights"); Robins v. Meecham, 60 F.3d 1436, 1442 (9th Cir.1995) (holding that supervisor can violate a prisoner's Eighth Amendment rights by failing to intervene when official acts unconstitutionally); O'Neill v. Krzeminski, 839 F.2d 9, 11 (2d Cir.1988) ("A law enforcement officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers").

Defendants appear to argue LiCalsi did not violate Plaintiff's Fourth Amendment rights or observe Benabente violate Plaintiff's rights.   Defendants submit LiCalsi's declaration in which he states that when he entered Benabente's office Plaintiff was sitting by himself, was not handcuffed, and appeared to LiCalsi to be there voluntarily.   LiCalsi states that all the communication was done with Plaintiff in Spanish.   While minimal, there appears to be a sufficient inferential evidence for the court to find a disputed issue of fact on whether LiCalsi

kept Plaintiff in Benabente's office knowing Plaintiff's Fourth Amendment rights were being violated.   As discussed above, there is evidence LiCalsi may have told Benabente to bring Plaintiff to the office.   Even not considering this evidence, there is evidence of a "plan" to obtain LiCalsi's money.   Given the evidence of the plan and the evidence this matter was not investigated in the normal way, a reasonable jury could conclude that upon finding Plaintiff in Benabente's office, LiCalsi knew he was not there voluntarily.   There is evidence LiCalsi knew Plaintiff and Benabente were discussing Plaintiff paying LiCalsi money in exchange for Plaintiff not prosecuting Benabente.   There is evidence that possible charges LiCalsi could bring against Plaintiff were discussed.   There is evidence LiCalsi brought up Plaintiff's possible involvement in statutory rape.   There is no evidence Benabente or LiCalsi told Plaintiff he could leave at any time.   There is no evidence LiCalsi told Benabente to make sure Plaintiff knew he could leave and did not have to talk to them.   While the evidence showing LiCalsi's direct knowledge of a Fourth Amendment violation taking place in the presence is minimal, given the entire facts of this case, the court declines to find on summary judgment that LiCalsi personally did not violate Plaintiff's Fourth Amendment rights when he went into Benabente's office.   Thus, the court will not grant summary judgment on the ground that Benabente personally did not violate Plaintiff's Fourth Amendment rights.

## *2.  Equal Protection*

_____Defendants contend that they are entitled to summary judgment on Plaintiff's equal protection claim because Plaintiff cannot show that he was treated differently than similarly situated individuals.   In his opposition and at the hearing, Plaintiff stated that he is proceeding on a Fourth Amendment claim and a substantive due process claim.   Because Plaintiff admits that his Fourteenth Amendment claim is not based on a violation of his equal protection rights, Defendants are entitled to summary judgment on any possible equal protection claim.

## *3.  Due Process*

Defendants contend that Plaintiff's due process claim is subject to dismissal.   In the

opposition and at the hearing, Plaintiff clarifies that his reference to the Fourteenth Amendment and "due process" is to a violation of Plaintiff's substantive due process rights and not Plaintiff's procedural due process rights.   In their reply, Defendants contend that Plaintiff's substantive due process claim fails because Plaintiff admits he owed the money and Plaintiff benefitted from LiCalsi's actions.

The touchstone of the Due Process Clause is protection of the individual against arbitrary action of government. County of Sacramento v. Lewis, 523 U.S. 833, 845 (1998) (quoting Wolff v. McDonnell, 418 U.S. 539, 558 (1974)).   The Due Process clause confers both procedural and substantive rights.   United States v. Salerno, 481 U.S. 739, 746 (1987).   The substantive component of the Due Process Clause bars "'certain government actions regardless of the fairness of the procedures used to implement them.'"   Lewis, 523 U.S. at 840 (quoting Daniels v. Williams, 474 U.S. 327, 331 (1986)).   The substantive component of due process "protects individuals against state action that either 'shocks the conscience,' Rochin v. California, 342 U.S. 165, 172 (1952), or interferes with the rights 'implicit in the concept of ordered liberty,' Palko v. Connecticut, 302 U.S. 319, 325-26 (1937)."   Martinez v. City of Oxnard, 337 F.3d 1091 (9th Cir. 2004).   The Supreme Court has made it clear that this standard requires more than that "private sentimentalism" is offended.   Rochin, 342 U.S. at 172.   Instead, the inquiry focuses on whether the challenged conduct is "'shocking to the universal sense of justice.'"   Lewis, 523 U.S. at 850 (quoting Betts v. Brady, 316 U.S. 455 (1942)).   In other words, the challenged conduct must be "'conscience shocking, in a constitutional sense.'"   Lewis, 523 U.S. at 847 (quoting Collins v. City of Harker Heights, 503 U.S. 115, 128 (1992)).

The Supreme Court has pointed out that actions "intended to injure in some way unjustifiable by any government interest" are those "most likely to rise to the conscience-shocking level."   Lewis, 523 U.S. at 849.   Acts that fall between the poles of negligence and malignent intent require courts to make "closer calls," see id. at 849, in which the determination of what shocks the conscience is context-specific.   "Deliberate indifference that shocks in one

1  environment may not be so patently egregious in another. . . ." Id. at 850.

2  Preliminarily, the court notes that in Graham v. Connor, 490 U.S. 386 (1989), the United

3  States Supreme Court found that substantive due process cannot supply the basis for a civil rights

4  claim if the challenged governmental conduct is prohibited by another, more specific,

5  constitutional right. Id. at 394-95; Buckles v. King County, 191 F.3d 1127, 1137 (9th Cir. 1999);

6  Macri v. King County, 126 F.3d 1125, 1128 (9th Cir.1997).  Here, much of the conduct at issue is

7  covered by the Fourth Amendment, including Plaintiff's alleged seizure in Benabente's office.

8  However, Plaintiff's substantive due process claim appears to include conduct beyond his seizure

9  and detention.   Plaintiff's substantive due process claim includes Benabente's use of his position

10  to start an investigation, detain Plaintiff, and obtain money.   LiCalsi would not have been able

11  to orchestrate the investigation nor would he have had as much influence to demand his money

12  had he been an ordinary citizen.   Because the conduct underlying the substantive due process

13  claim goes beyond the seizure, it is not completely covered by the Fourth Amendment.  A

14  substantive due process claim may be available because no other constitutional amendment

15  covers the entire conduct at issue in this action.

16  Most cases alleging police conduct that shocks the conscience have involved allegations

17  of excessive force or physical brutality caused by government actors.  Braley v. City of Pontiac,

18  906 F.2d 220, 226 (6th Cir.1990).   In Rochin v. California, 342 U.S. 165 (1952), the Supreme

19  Court suppressed evidence obtained when the police broke into a suspect's house and, after

20  witnessing the suspect swallow two capsules, initially attempted to forcibly extract the capsules

21  from his mouth and then had his stomach pumped in order to recover them.   In holding that this

22  was conduct that "shock[ed] the conscience" and therefore violated due process guarantees, the

23  Supreme Court stated that "[i]llegally breaking into the privacy of the petitioner, the struggle to

24  open his mouth and remove what was there, the forcible extraction of his stomach's contents--this

25  course of proceeding by agents of government . . . are methods too close to the rack and the

26  screw to permit constitutional differentiation."  Id. at 172.   In Rutherford v. City of Berkeley,

27

28  34

780 F.2d 1444, (9th Cir.1986), the Ninth Circuit allowed a Section 1983 claim on the basis of a substantive due process violation where a plaintiff alleged that police officers beat him without provocation and without arresting him. Id. at 1447-48.   The Ninth Circuit also found a Section 1983 claim available when a plaintiff proved that the police had stranded her in a dangerous neighborhood at night where she was subsequently raped.  Wood v. Ostrander, 879 F.2d 583, 596 (9th Cir.1989).

In contrast, courts have been hesitant to find a substantive due process violation based on government actors' conduct during investigations and when obtaining evidence.   In Breithaupt v. Abram, 352 U.S. 432 (1957), the Supreme Court rejected the defendant's claim that his conviction for involuntary manslaughter arising out of a vehicular collision violated the substantive due process clause because at trial the government introduced blood evidence that was seized from the defendant by a needle while he was unconscious. The Supreme Court explained that the distinction between that case and Rochin was that "there is nothing 'brutal' or 'offensive' in the taking of a sample of blood when done, as in this case, under the protective eye of a physician." Id. at 435.   Similarly, in Irvine v. People of State of California, 347 U.S. 128 (1954), the defendant sought to invalidate his conviction on the ground that, while he was away, the police had a locksmith make a key to his house and then entered and installed a microphone in the house. The Supreme Court declined the defendant's attempt to "bring [his] case under the sway of" Rochin because Rochin "presented an element totally lacking here-coercion ... applied by a physical assault upon his person to compel submission to the use of a stomach pump." Id. at 133.   In United States v. Simpson, 813 F.2d 1462 (9th Cir. 1987), the Ninth Circuit rejected a substantive due process claim where a government informant pretended to be the defendant's close personal friend and had sex with the defendant on regular basis.   The Ninth Circuit found that the Due Process Clause "does not protect [the individual] from voluntarily reposing his trust in one who turns out to be unworthy of it." Id. 1466.

Most recently in Chavez v. Martinez, 538 U.S. 760 (2003), the Supreme Court again

highlighted the fact that the focus of a Fourteenth Amendment substantive due process analysis is the brutality of the police conduct.   In <u>Chavez</u>, a police sergeant failed to read Miranda warnings to a suspect before questioning him at hospital while he was being treated for bullet wounds he received from another officer. <u>Id</u>. at 764.   A plurality of four Justices found no substantive due process violation because the questioning did not interfere with medical treatment and there was no evidence the conduct exacerbated his injuries or prolonged his stay. <u>Id</u>. at 773.  The plurality explained that the Fourteenth Amendment substantive due process clause is applicable in cases involving "police torture or other abuse that results in a confession," 538 U.S. at 773 (Thomas, J.), and that "[c]onvictions based on evidence obtained by methods that are 'so brutal and so offensive to human dignity' that they 'shoc[k] the conscience' violate the Due Process Clause." <u>Id</u>. (quoting <u>Rochin</u>, 342 U.S. at 172).   While disagreeing on whether the officers' conduct shocked the conscience under the fact pattern, Justice Stevens similarly concluded that "brutal" police conduct that is "the functional equivalent of an attempt to obtain an involuntary confession from a prisoner by tortuous methods" constitutes a due process violation as a matter of law.  <u>Chavez</u>, 538 U.S. at 783-84 (Stevens, J., concurring in part and dissenting in part).

        Taking the facts in the light most favorable to Plaintiff, LiCalsi and Benabente came up with a plan to track down Plaintiff and obtain money Plaintiff admits he owned LiCalsi. Benabente, at LiCalsi's direction, found Plaintiff and brought him to Benabente's office instead of arresting him.   In their discussion, Benabente and LiCalsi implied that if Plaintiff paid LiCalsi the money, Plaintiff would not be prosecuted on the hit and run, the traffic violations, and possibly statutory rape.   At best, Plaintiff has shown coercive governmental action to obtain a quick result that was favorable to the personal interests of the governmental agent.   Case authority indicates that threats, whether intended to coax a confession, arbitrarily frighten, or obtain money, may be the subject of proper criticism; but they are not actionable under the substantive due process.  See <u>Cruz-Erazo v. Rivera-Montanez</u>, 212 F.3d 617 (1st Cir. 2000)

36

(Police officers' alleged conduct in verbally harassing homeowners, intimidating them, occupying their property without permission, deliberately lying in official documents, and perjuring themselves in official court proceedings with intention of causing homeowners harm did not sufficiently "shock the conscience" so as to violate substantive due process).   Plaintiff has cited no cases, and the court could find none, holding a substantive due process violation occurs where the government agents' actions were limited to verbal threats and the plaintiff was not contacted once he agreed to pay money he admits he owed.   While Plaintiff may have been reasonably intimidated and frightened by Benabente and LiCalsi's conduct, there is no evidence Plaintiff was falsely arrested, falsely incarcerated, or physically harmed.   There is no evidence Plaintiff gave LiCalsi anything Plaintiff does not admit LiCalsi was entitled to.

The Ninth Circuit case that appears to be the closest to this case is <u>Johnson v. Barker</u>, 799 F.2d 1396 (9th Cir.1986).   In <u>Johnson</u>, the plaintiffs were given criminal citations as they hiked down Mt. St. Helens during its eruption in 1984.   The plaintiffs were alleged to have been in a restricted zone on the mountain.   <u>Id</u>. at 1398.[16] Counsel for the plaintiffs notified the prosecutor that the plaintiffs were never within the restricted zone on the mountain.   <u>Id</u>.   The sheriff's office still pushed for prosecution and after months of delay, the charges were dismissed.   The plaintiffs were then charged with attempting to violate an executive order that restricted certain parts of the mountain.   <u>Id</u>.   No trial was held on these charges and they were eventually dismissed because the Washington Superior Court found the plaintiffs were not granted the right to a speedy trial. <u>Id</u>.   The plaintiffs later filed a civil rights action, alleging malicious prosecution of constitutional proportions on several basis, including substantive due process.   Among other arguments, the plaintiffs contended that the sheriff and prosecutors pursued the action knowing it was baseless for "political" reasons.   The Ninth Circuit found that the conduct of the government actors was

---

[16]   The Sheriff that issued the citation was in a helicopter, and refused to give the plaintiffs a ride down the mountain. <u>Id</u>. As a result of this the plaintiffs were forced to spend another night on the mountain, and the volcano erupted during that night. <u>Id</u>.   A helicopter had to come up the mountain to get them the next day, as they were unable to get down of their own accord. <u>Id</u>.

1   not "so egregious as to 'shock the conscience.'"   Id. at 1400 (quoting Rochin, 342 U.S. at 169).

2          Here, like the sheriff in Johnson who pursued charges for political reasons,  LiCalsi and

3   Benabente investigated Plaintiff, questioned Plaintiff, and discussed accepting money owed to

4   LiCalsi in return for not prosecuting Plaintiff for allegedly personal reasons.   Viewing the

5   evidence in the light most beneficial to Plaintiff, both the Johnson sheriff's and LiCalsi's motives

6   were personal and unrelated to their prescribed role in law enforcement.   Because pursuing a

7   criminal prosecution for political reasons did not shock the conscience in Johnson, neither does

8   pursuing an investigation and discussing a potential prosecution for personal reasons shock the

9   conscience.   Misuse of the legal process alone is generally insufficient to sustain a claim for a

10   substantive due process violation.   See Torres v. Superintendent of Police of Puerto Rico, 893

11   F.2d 404, 410 (1st Cir. 1990).

12          Unlike those cases in which courts have found the government agent's conduct shocked

13   the conscience, Plaintiff has not alleged any facts involving excessive force or physical brutality

14   caused by government actors.   Plaintiff admits he was not subjected to any unnecessary force.

15   Plaintiff admits he owed LiCalsi $500.   Plaintiff admits that Benabente's original stop was

16   lawful.   Plaintiff's argument is that once Plaintiff was found, LiCalsi should have been forced to

17   obtain the $500 in a civil proceeding and LiCalsi impermissibly used his position as District

18   Attorney to obtain the money by the use of threats not available to ordinary citizens.   The

19   Supreme Court has expressed great reluctance to expand the doctrine of substantive due process.

20   Chavez v. Martinez,  538 U.S. 760, 775 (2003); Albright v. Oliver, 510 U.S. 266, 271 (1994);

21   Reno v. Flores, 507 U.S. 292, 302 (1993).   This is not a case where the court should expand

22   substantive due process.  While the court's conscience will be troubled if Plaintiff's allegations

23   are true, the court's conscience will not be shocked.   Thus, Defendants are entitled to summary

24   judgment on Plaintiff's substantive due process claim.

25   *4.  Conspiracy*

26          In their motion for summary judgment, Defendants request summary judgment on a

27

28                                              38

possible allegations of conspiracy.   Plaintiff has not opposed Defendants' motion.  At the

hearing, Plaintiff stated that he is not alleging a conspiracy claim pursuant to 42 U.S.C. §

1985(c).   Thus, based on the undisputed facts, Defendants are entitled to summary judgment on

any claim alleging a violation of Section 1985(c).

### 5.  Prosecutorial Immunity

Defendants contend that the court should grant LiCalsi summary judgment because he is

entitled to prosecutorial immunity.

A prosecutor is protected by absolute immunity from liability for damages under Section

1983 "when performing the traditional functions of an advocate."   Kalina v. Fletcher, 522 U.S.

118, 131 (1997).   Officials are entitled to qualified rather than absolute immunity, however,

when they perform investigative functions.  Kalina, 522 U.S. at 126; Burns v. Reed, 500 U.S.

478, 494- 96 (1991).   To determine whether an action is administrative, investigative, or

advocatory, the court is to apply a "functional" analysis.  Burns, 500 U.S. at 486.  A prosecutor's

activity involves an advocacy function and is protected by absolute immunity only when that

activity is "intimately associated with the judicial phase of the criminal process."   Imbler v.

Pachtman, 424 U.S. 409, 430, (1976); see also Kalina, 522 U.S. at 125.[17]  Acts undertaken by a

prosecutor "in preparing for the initiation of judicial proceedings or for trial, and which occur in

the course of his role as an advocate for the State," are entitled to the protections of absolute

immunity.   Kalina, 522 U.S. at 126. As the Supreme Court explained:

> [T]he concern with litigation in our immunity cases is not merely a generalized
> concern with interference with an official's duties, but rather is a concern with
> interference with the conduct closely related to the judicial process. . . . That
> concern therefore justifies absolute prosecutorial immunity only for actions that

---

[17]   Advocatory conduct by the prosecutor that is intimately associated with the judicial
phase of the criminal process is sometimes called "quasi-judicial" conduct. See, e.g., Broam v.
Bogan, 320 F.3d 1023, 1029 (9th Cir.2003) ("[I]n deciding whether to accord a prosecutor
immunity from a civil suit for damages, a court must first determine whether a prosecutor has
performed a quasi-judicial function. If the action was part of the judicial process, the prosecutor
is entitled to the protection of absolute immunity whether or not he or she violated the civil
plaintiff's constitutional rights.") (citation and internal quotation marks omitted).

are connected with the prosecutor's role in the judicial proceedings, not for every litigation-inducing conduct.

Burns, 500 U.S. at 494.  For example, absolute prosecutorial immunity protects conduct such as maliciously initiating a prosecution, using perjured testimony at trial, and suppressing material evidence at trial.  Imbler, 424 U.S. at 430. A  prosecutor is absolutely immune for his direct participation in a probable cause hearing, see Burns, 500 U.S. at 491, and for preparing and filing charging documents, see Kalina, 522 U.S. at 130.

The Supreme Court has consistently "emphasized that the official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." Burns, 500 U.S. at 486.  Prosecutorial immunity depends on "the nature of the function performed, not the identity of the actor who performed it." Kalina, 522 U.S. at 127 (quoting Forrester v. White, 484 U.S. 219, 229 (1988)).   Thus, "the actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor." Buckley v. Fitzsimmons, 509 U.S. 259, 273 (1993); Genzler v. Longanbach,  410 F.3d 630, 636 (9th Cir. 2005).   The presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties.  Burns, 500 U.S. at 486-86.

LiCalsi contends that he is entitled to prosecutorial immunity because he only assigned the investigation Benabente, agreed to informally resolve the matter, and decided not to prosecute.   LiCalsi contends that he did nothing that would remove him from the protection of prosecutorial immunity.   LiCalsi states that it is not unusual for district attorneys to not prosecute if a victim receives restitution and does not want to prosecute.

Plaintiff's only opposition to LiCalsi's request for prosecutorial immunity is a cite to Bishop Paiute Tribe v. County of Inyo, 275 F.3d 893 (9th Cir. 2002).   In Bishop, the Ninth Circuit addressed whether a district attorney is a state actor or county officer for the purpose of Eleventh Amendment immunity. Id.  906-909.   In setting the standard for determining when a district attorney is acting as a county officer, the Ninth Circuit used the test for prosecutorial

40

immunity, along with California law, as a guidance. Id. at 909.   Bishop was vacated by the

Supreme Court because the Supreme Court found the plaintiff tribe was not a person with

standing to sue pursuant to Section 1983.   See Inyo County, Cal. v. Paiute-Shoshone Indians of

the Bishop, 538 U.S. 701 (2003).   Other than referencing the test for prosecutorial immunity,

Bishop offers little insight into this issue.

Viewing the evidence in the light most favorable to Plaintiff, as the court must on this

motion for summary judgment, the court cannot find the undisputed facts establish that LiCalsi's

actions were solely associated with the judicial phase of the criminal process.   A reasonable jury

could find that LiCalsi was acting as an investigator.   The undisputed facts reveal that LiCalsi

directed Benabente to identify and locate Plaintiff.   There is evidence that LiCalsi and Benabente

had a "plan" to identify the driver of the car and get LiCalsi's $500 back.   Both when Benabente

first detained Plaintiff and when Benabente, Plaintiff, and LaCalsi were in Benabente's office,

the accident and the fact Plaintiff owed LiCalsi $500 were discussed.   The evidence shows that

at LiCalsi's direction Benabente also told Plaintiff it was a crime to have sex with a minor.

Based on the evidence before the court, a reasonable jury could conclude that this conversation

was not plea bargaining.   There is evidence that LiCalsi's role in the conversation was that of an

investigator, along with being the victim of the crime.   From the evidence currently cited by the

parties, LiCalsi never specifically told Plaintiff that if he made restitution LiCalsi would not

prosecute him.   From the evidence, LiCalsi made the decision not to prosecute Plaintiff for the

hit and run in the hallway after the alleged Fourth Amendment violation had ended and left it up

to Benabente whether to pursue charges for the traffic violations.   By the time LiCalsi acted as a

prosecutor, and made the decision not to prosecute, the constitutional violations alleged in this

action were over.   There are facts indicating that LiCalsi's actions went beyond those connected

with a prosecutor's role in the judicial proceedings.

The Supreme Court has been quite sparing in its recognition of absolute immunity, and

has refused to extend it any further than its justification would warrant.   Burns, 500 U.S. at 487.

1     In determining whether a prosecutor is entitled to immunity, the court must decide whether the

2     alleged unconstitutional conduct occurred during the performance of an investigative function,

3     such as gathering physical evidence, conducting interrogatories, determining whether a crime has

4     been committed, and deciding whether probable cause exists to arrest a suspect. Buckley v.

5     Fitzsimmons, 509 U.S. 259, 273-74 (1993).   Although the Supreme Court has hesitated to draw

6     a bright line on when a prosecutor is no longer entitled to absolute immunity, the relevant

7     question is whether a prosecutor's investigation is of the type normally conducted by police, in

8     which case a prosecutor would be entitled only to qualified immunity, or whether the

9     investigation is entwined with the judicial process, thereby affording the prosecutor the

10     heightened protection of absolute immunity. Genzler v. Longanbach, 410 F.3d 630, 638 (9th Cir.

11     2005).  In other words, whether the prosecutor committed an act, or authoritatively directed the

12     commission of an act, that ordinarily would be related to police activity as opposed to judicial

13     activity.  Id. at 641.   The Supreme Court has denied absolute immunity to prosecutors who had

14     fabricated evidence "during the early stage of the investigation" when "police officers and

15     assistant prosecutors were performing essentially the same investigatory functions." Buckley,

16     509 U.S. at 273.   A prosecutor does not have absolute immunity for providing legal advice to

17     police that probable cause exists to arrest a suspect.   Burns, 500 U.S. at 491, or for personally

18     attesting to the truth of evidence in support of charging documents. Kalina, 522 U.S. at 130

19     _____ Here, LiCalsi's actions in directing the investigation and discussing the accident and $500

20     with Benabente and Plaintiff is conduct that ordinarily would be related to police activity.

21     LiCalsi was conducting an investigative function.  The court finds no reason to extend

22     prosecutorial immunity to an investigatory conversation where a party is told he is facing

23     possible charges, he is told he owes a victim money, and the party agrees to pay the victim

24     restitution.   Thus, LiCalsi is not entitled to prosecutorial immunity.

25     ***6.  Qualified Immunity***

26         LiCalsi contends that he is entitled to qualified immunity.  Qualified immunity is

27

28                        42

immunity from suit, not simply immunity from liability.  Mitchell v. Forsyth, 472 U.S. 511, 526

(1985).  Thus, it must be determined at the earliest possible stage of the litigation.  Hunter v.

Bryant, 502 U.S. 224, 227 (1991) (per curiam ).

Whether a defendant is entitled to qualified immunity is a two-part inquiry. The first step

requires the court to ask: "Taken in the light most favorable to the party asserting the injury, do

the facts alleged show the officer's conduct violated a constitutional right?"  Saucier v. Katz, 533

U.S. 194, 201 (2001); Blanford v. Sacramento County, 406 F.3d 1110, 1115 (9th Cir. 2005).   In

Saucier, the Supreme Court disapproved of the Ninth Circuit's former practice of denying

summary judgment "any time a material issue of fact remains" because such a practice "could

undermine the goal of qualified immunity to 'avoid excessive disruption of government and

permit the resolution of many insubstantial claims on summary judgment.'" Saucier, 533 U.S. at

202 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  In assessing the first prong at

summary judgment the court should look beyond the complaint to the broader summary

judgment record.  Riverdale Mills Corp. v. Pimpare, 392 F.3d 55, 62 (1st Cir.2004).   If,

construing the evidentiary record in the light most favorable to the plaintiff, a court concludes

that the plaintiff's rights were violated, then the court must proceed to the second step of the

qualified immunity analysis, pursuant to which the officer is entitled to qualified immunity if the

law was not "clearly established," i.e., if it would not have been clear to a reasonable officer that

his conduct was unlawful under the circumstances.  Saucier, 533 U.S. at 202; Blanford, 406 F.3d

at 1115. "Whether the law was clearly established is a pure question of law for the court to

decide."  Carnell v. Grimm, 74 F.3d 977, 978 (9th Cir.1996).   The clearly-established inquiry, "it

is vital to note, must be undertaken in light of the specific context of the case, not as a broad

general proposition. . . ." Saucier, 533 U.S. at 201 (emphasis added).   Thus, "[t]he relevant,

dispositive inquiry" is "whether it would be clear to a reasonable officer that his conduct was

unlawful in the situation he confronted."  Id. at 202.   "If the law did not put the officer on notice

that his conduct would be clearly unlawful, summary judgment based on qualified immunity is

1    appropriate." Id.

2    *a. Fourth Amendment*

3         For the reasons discussed above, taking the evidence in the light most favorable to

4    Plaintiff, Plaintiff's Fourth Amendment rights were violated.    Taking the evidence in the light

5    most favorable to Plaintiff, a reasonable person would not have felt free to disregard Benabente's

6    request to come to the District Attorney's Office and/or not stay in Benabente's office.    In

7    addition, taking the evidence in the light most favorable to Plaintiff, Benabente's investigatory

8    stop was longer than necessary to conduct any investigation.

9         Turning to the second step of a qualified immunity analysis, the court finds that a

10   reasonable district attorney should have known his conduct was wrong.   In making this finding,

11   the court notes that no case has specifically discussed at what point a legitimate seizure is turned

12   into an unlawful investigatory detention by a district attorney and investigator discussing paying

13   money owed instead of have charges filed.    However, case law clearly states that officials are

14   "not entitled to qualified immunity simply because no case with materially similar facts has held

15   their conduct unconstitutional.   The standard is one of fair warning: where the contours of the

16   right have been defined with sufficient specificity that a state official had fair warning that her

17   conduct deprived a victim of his rights, she is not entitled to qualified immunity."   Haugen v.

18   Brosseau, 339 F.3d 857, 873 (9th Cir. 2003).

19        At the time Benabente and Plaintiff went to Benabente's office and discussed the $500

20   with LiCalsi, the law was clear that for an interaction with law enforcement to be voluntary a

21   person must reasonably believe that he or she was free to leave. Morgan, 997 F.2d at 1253.   As

22   discussed above, taking the facts in the light most favorable to Plaintiff a reasonable person

23   would not have believed that they had any ability to end the conversation with Benabente, not

24   accompany Benabente to his office, and not stay in the office until Benabente indicated he could

25   leave.   While no specific cases have been cited discussing whether consent is voluntary after an

26   officer tells a person they can either be arrested or come with the officer for further discussions,

27

28                                              44

an officer should have known such a statement could make consent involuntary.   LiCalsi is not entitled to qualified immunity on the ground that a reasonable official would not know he was violating Plaintiff's rights because Plaintiff was there voluntarily.   A reasonable district attorney should have known that bringing a person to an office for questioning under threat of arrest and not allowing him to leave did not constitute a voluntary interaction with police.

At the time Benabente and Plaintiff went to Benabente's office and discussed the $500 with LiCalsi, the law was clear that for an investigatory detention to not violate the Fourth Amendment it must last no longer than necessary to effectuate the purpose of the stop. Florida v. Royer, 460 U.S. 491, 500 (1983).   The reasonable suspicion analysis is highly contextual and fact-specific, see Sharpe, 470 U.S. at 685, making it more difficult to find that a reasonable official would have known he or she was violated a person's Fourth Amendment rights. However, as discussed above, all cases where the movement of a person were upheld involved situations where there were significant facts supporting the officer's belief that the person needed to be moved to quickly confirm or dispel the suspicion surrounding of the person. See Charley, 396 F.3d at 1080; Gallegos, 308 F.3d at 991; Halvorsen, 146 F.3d at 684.   LiCalsi has pointed to no undisputed facts that would lead a reasonable officer to believe that he had the right to seize and detain Plaintiff for the purposes of discussing the hit and run and $500.   By the time the seizure at issue in Plaintiff's Fourth Amendment claim began, Plaintiff had already confessed to his involvement in the hit and run.    Thus, LiCalsi is not entitled to qualified immunity on the ground that a reasonable officer would not know he was violating Plaintiff's rights because the officer believed the seizure was a valid investigatory detention.   A reasonable district attorney should have known that a conversation discussing the payment of $500 was not necessary to quickly resolve suspicions regarding Plaintiff.   Thus, LiCalsi is not entitled to qualified immunity on the Fourth Amendment claim.

*b.  Substantive Due Process*

As discussed above, taken in the light most favorable to Plaintiff, the undisputed facts do

45

not show a substantive due process violation.   As such, it is unnecessary to determine whether a reasonable district attorney would know that his conduct was unlawful.   However, even if the court were to conclude that LiCalsi violated Plaintiff's substantive due process rights, LiCalsi is entitled to qualified immunity.

It would not have been clear to a reasonable district attorney that the manner in which he directed Benabente to find Plaintiff and obtain LiCalsi's $500 and LiCalsi's conduct in Benabente's office amounted to a violation of Plaintiff's Fourteenth Amendment right to substantive due process.   LiCalsi's directions to Benabente and conduct in Benabente's office lacked the brutality that has previously marked the police conduct found by the Supreme Court to be "shocking to the conscience."   Although it was clearly established in <u>Rochin</u> that "[p]olice conduct which 'shocks the conscience' constitutes a violation of substantive due process," a reliance on <u>Rochin</u> is unavailing here.

A plaintiff cannot defeat a summary judgment motion on qualified immunity grounds simply by pointing to case law clearly establishing a general proposition, such as the proposition that conduct that shocks the conscience violates substantive due process. <u>Brosseau v. Haugen</u>, – U.S. – , 125 S.Ct. 596, 599 (2004); <u>Saucier</u>, 533 U.S. at 202.   Rather, the inquiry is whether it was clearly established that it shocks the conscience, and therefore violates substantive due process, to use the resources of the district attorney's office to find a person and demand money the person admits he owes by threatening criminal prosecution.   The court concludes that a reasonable district attorney in LiCalsi's position would have known his conduct was wrong but would not necessarily have known that his conduct would meet the "shocks the conscience" standard.

Plaintiff has failed to identify any relevant case law addressing the issue of when a district attorney's use of his office and position to obtain money owed to him crosses the constitutional line and "shocks the conscience" for substantive due process purposes.   Nor has the court's attention been directed to any case available to guide LiCalsi's actions when presented with this

situation.    Moreover, although <u>Chavez</u> had not been decided at the time of LiCalsi's actions, it

does not establish that the manner of finding Plaintiff and discussing the $500 and Plaintiff's

potential prosecution violated substantive due process.    Four Justices in <u>Chavez</u> concluded that

the questioning of the plaintiff did not "shock the conscience" despite the fact that the plaintiff

was clearly suffering from physical pain as well as mental anguish at the time and it appeared the

police officer exploited the plaintiff's pain and suffering of the purpose of securing an

incriminating statement.    Because the conduct in the present case was far less egregious than the

conduct in <u>Chavez</u>, the court concludes that a reasonable district attorney could believe that the

conduct in the present case did not shock the conscience.    Thus, LiCalsi is entitled to qualified

immunity on the substantive due process claim.

**B.  Official Capacity Claims**

Defendants contend that LiCalsi is entitled to summary judgment to the extent he is sued

in his official capacity.  Plaintiff has not addressed this argument.

The distinction between personal capacity suits and official capacity suits is that official

capacity suits generally represent only another way of pleading an action against an entity of

which the officer is an agent.    <u>Kentucky v. Graham</u>, 473 U.S. 159, 165 (1985).    A personal

capacity suit seeks to impose personal liability upon a government official for actions taken

under color of state law.  By contrast, "in an official-capacity suit the entity's 'policy or custom'

must have played a part in the violation of federal law."  <u>Id</u>. at 166.    An official-capacity suit

based upon the allegation that an official policy or custom caused a deprivation of federally

protected rights is a suit against the entity; "[i]t is not a suit against the official personally, for the

real party in interest is the entity."  <u>Graham</u>, 473 U.S. at 165-66;  <u>Monell v. New York Dep't of</u>

<u>Social Services</u>, 436 U.S. 658, 690 n. 55 (1978).    Under <u>Monell</u>, municipalities are "persons"

subject to suit under Section 1983 based upon an allegation that an official policy or custom is

responsible for a deprivation of federally protected rights.  <u>Monell</u>, 436 U.S. at 690-91 (1978).

***1.  Immunity***

1      Defendants contend that the claim against LiCalsi in his official capacity should be

2  dismissed because LiCalsi is subject to Eleventh Amendment immunity.   State officers enjoy

3  sovereign immunity under the Eleventh Amendment from suits against them in their official

4  capacities when they are acting on behalf of the state.   Edelman v. Jordan, 415 U.S. 651, 663

5  (1974).   State actors are also not "persons" within the meaning of Section 1983 and therefore

6  cannot be held liable under that statute.   Will v. Michigan Dept. of State Police, 491 U.S. 58, 71

7  (1989).

8      Generally, district attorneys are functioning as officers of the state when they decide

9  whether to prosecute an individual.   Weiner v. San Diego County, 210 F.3d 1025, 1031 (9th Cir.

10  2000).   However, as discussed above, there is a disputed issue of fact on whether LiCalsi was

11  acting in his capacity as a prosecutor or for his personal benefit in this action.   For the same

12  reasons why LiCalsi is not entitled to prosecutorial immunity, LiCalsi is not entitled to Eleventh

13  Amendment immunity.

14  **_2.  Redundant_**

15      Defendant LiCalsi contends the official capacity suit against him is redundant of the suit

16  against the County of Madera.   Plaintiff did not address this argument in his opposition, but at

17  the hearing Plaintiff argued that LiCalsi was liable because he acted under color of state law.

18      Claims against LiCalsi in his official capacity are really claims against the municipal

19  entity itself.   "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit

20  against the entity."   Graham, 473 U.S. at 166; Larez v. City of Los Angeles, 946 F.2d 630, 646

21  (9th Cir.1991).   The defendant in a civil rights case brought under Monell is the local

22  government entity, and not the local government official sued in his official capacity on behalf of

23  the local governmental entity.   Luke v. Abbott, 954 F.Supp. 202, 203-4 (C.D.Cal.1997); Vance v.

24  County of Santa Clara, 928 F.Supp. 993, 996 (N.D.Cal.1996)).   Naming a local government

25  official in an official capacity claim "only leads to a duplication of documents and pleadings, as

26  well as wasted public resources for increased attorneys fees."   Luke, 954 F.Supp. at 204.   Thus,

27

28                                         48

1    courts have found that when both an official in his official capacity and the local government

2    entity are named in a lawsuit, the official in his official capacity is a redundant defendant and

3    may be dismissed.  Id. at 203.   The suit against LiCalsi in his official capacity is duplicative of

4    the suit against he County of Madera.  Thus, the court will grant Defendant LiCalsi summary

5    judgment to the extent he is sued in his official capacity.

6    **C. County of Madera**

7        Defendants contend that Defendant County of Madera is entitled to summary judgment.

8    Defendants contend that there is no showing of any constitutional violations.   Assuming that

9    there is a showing of a constitutional violation, Defendants contend there is no evidence that any

10   policy or custom of the County of Madera was the moving force behind the alleged constitutional

11   violation.  Plaintiff contends that his theory of liability against the County is based on the fact

12   that LiCalsi was a policymaker for the County of Madera.  Plaintiff also contends that the County

13   of Madera has a pattern and practice of not properly training and supervising its investigators.

14       Local governments can be "persons" subject to liability under 42 U.S.C. § 1983.  Monnell

15   v. Dep't of Social Servs., 436 U.S. 658, 690 (1978).  However, a local government unit may not

16   be held responsible for the acts of its employees under a respondent superior theory of liability.

17   Monell, 436 U.S. at 691; Fuller v. City of Oakland, 47 F.3d 1522, 1534 (9th Cir. 1995).  A

18   Section 1983 plaintiff may establish local government liability based on official policy or custom

19   only by (1) alleging and showing that a city or county employee committed the alleged

20   constitutional violation under a formal governmental policy or longstanding practice or custom

21   that is the customary operating procedure of the local government entity; (2) establishing that the

22   individual who committed the constitutional tort was an official with final policy-making

23   authority and that the challenged action itself was an act of official governmental policy which

24   was the result of a deliberate choice made among various alternatives; or (3) proving that an

25   official with final policy-making authority either delegated policy-making authority to a

26   subordinate or ratified a subordinate's unconstitutional decision or action and the basis for it.

27

28                                                49

1  Monnell, 436 U.S. at 691; Gillette v. Delmore, 979 F.2d 1342, 1346-47 (9th Cir. 1992).

2  *1.  Underlying Constitutional Violations*

3         Defendants contend that the County of Madera is not liable because there were no

4  underlying constitutional violations.   A city or county cannot be liable for damages based on the

5  actions of one of its employees unless the employee inflicted constitutional harm. City of Los

6  Angeles v. Heller, 475 U.S. 796, 799 (1986); Scott v. Henrich, 39 F.3d 912, 916 (9th Cir. 1994);

7  Forrester v. City of San Diego, 25 F.3d 804, 808 (9th Cir. 1994). This does not mean that the

8  liability of municipalities or counties turns on the liability of individual employees; rather, "it is

9  contingent on a violation of constitutional rights."   Scott, 39 F.3d at 916.   Where the conduct of

10  individual employees is found reasonable and proper, the municipality or county cannot generally

11  be held liable because no constitutional violation occurred.  See Scott, 39 F.3d at 916; Forrester,

12  25 F.3d at 808.   As discussed above, Defendants are entitled to summary judgment on Plaintiff's

13  substantive due process claim.   Thus, the County of Madera is entitled to summary judgment on

14  Plaintiff's substantive due process claim, and the civil rights case against the County of Madera

15  will only proceed on a Fourth Amendment claim.

16  *2.  LiCalsi as a Policy Maker*

17         One of Plaintiff's theories of Monnell liability is that LiCalsi, who committed the

18  constitutional violations, was a policy maker of the County of Madera.   "To hold a local

19  government liable for an official's conduct, a plaintiff must establish that the official (1) had final

20  policymaking authority 'concerning the action alleged to have caused the particular constitutional

21  or statutory violation at issue' and (2) was the policymaker for the local governing body for the

22  purposes of the particular act."  Weiner v. San Diego County, 210 F.3d 1025, 1028 (9th

23  Cir.2000).  The determination of who has final policymaking authority is a question of law for

24  the court to decide, not the jury, based on state law, which includes "state and local positive law

25  as well as custom or usage having the force of law." Jett v. Dallas Indep. Sch. Dist., 491 U.S.

26  701, 737 (1989), *superseded by statute on other grounds as stated in* Federation of African Am.

27

Contrs. v. City of Oakland, 96 F.3d 1204, 1205 (9th Cir.1996)).

While not addressed by the parties, the court notes that to the extent Plaintiff's case is premised on LiCalsi's decision not to prosecute, LiCalsi was a policy maker for the State of California, and not the County of Madera.   The Ninth Circuit has held that when a prosecutor acts as an advocate, such as when he initiates a prosecution, he acts as a state officer rather than on behalf of a county.  See Weiner, 210 F.3d at 1031.   Because the County of Madera was not the actor with respect to LiCalsi's prosecution decisions, Plaintiff's Monell claim against the County of Madera fails to the extent it is based on LiCalsi's decisions about the prosecution. However, as discussed above, the only constitutional claim before the court is a potential Fourth Amendment violation.   There is no case authority indicating that LiCalsi's actions in detaining Plaintiff as part of the "plan" to obtain LiCalsi's $500 were made on behalf the State of California.   Thus, Monell liability is available for the Fourth Amendment claim.

Without citing evidence or authority, Defendants argue that LiCalsi was not a policy maker for the County of Madera.  Plaintiff has provided the opinion of a District Attorney Investigator that LiCalsi was the final decision maker and policymaker for the Madera County District Attorney's Office.  See Ginder Depo. at 34-35.   The court is hesitant to accept this evidence because there is no showing that Mr. Ginder is qualified to render an opinion on whether LiCalsi was a policy maker for the County of Madera.   However, the Ninth Circuit has found that a Nevada District Attorney is a county policymaker when he acts "outside the scope of active criminal prosecutions and outside the scope of prosecutorial discretion."  Botello v. Gammick,  413 F.3d 971, 979 (9th Cir. 2005).   Similar to Nevada, a California District Attorney is not a county policymaker when he or she is prosecuting or preparing to prosecute criminal violations of state law, but he or she is a county official for other purposes.  Weiner, 210 F.3d at 1031; Pitts v. County of Kern, 17 Cal.4th 340, 362-65 (1998).   Based on similar findings, the Ninth Circuit in Fazio v. City and County of San Francisco, 125 F.3d 1328 (9th Cir. 1997), held that certain deputy district attorneys are policymakers who may be terminated for partisan

51

1   reasons.   In light of this authority, there is support for the proposition that LiCalsi was a

2   policymaker for the County of Madera when he was acting outside the scope of his prosecutorial

3   discretion.

4          As the party moving for summary judgment Defendants have the initial burden of

5   demonstrating that no genuine issue of material fact exists as to whether LiCalsi was a

6   policymaker for the County of Madera.   See Celotex Corp.,, 477 U.S. at 325; MetroPCS, Inc. v.

7   City and County of San Francisco, 400 F.3d 715, 720 (9th Cir. 2005).   Here, Defendants have

8   failed to meet their burden of providing sufficient authority and allegations showing that LiCalsi

9   was not a policymaker for the County of Madera concerning the events underlying this action.

10  In light of the authority cited above, the court is unable to find no disputed issue of material fact

11  on whether LiCalsi was a policymaker.   Taking all inferences in Plaintiff's favor, there is a

12  disputed issue on whether the individual who committed the constitutional tort was an official

13  with final policymaking authority and that the challenged action itself was an act of official

14  governmental policy, which was the result of a deliberate choice made among various

15  alternatives.   As discussed above, there is a disputed issue of fact on whether LiCalsi violated

16  Plaintiff's Fourth Amendment rights.   Thus, Plaintiff's Monell claim may proceed on the theory

17  that a final policymaker for the County of Madera committed the constitutional violations.

18  ***3.  Custom***

19         In addition, there is evidence that a custom of the County of Madera, created by LiCalsi,

20  was the moving force behind the possible Fourth Amendment violation.   Governmental liability

21  can be imposed when conduct reflects "practices of ... officials permanent and well-settled as to

22  constitute a 'custom or usage' with the force of law."   Monell, 436 U.S. at 691.   "Custom"

23  differs from "policy" in that it is not necessary that the custom has received formal approval

24  through the municipality's official decision making channels.   Id. at 690-91.   Acts of omission,

25  as well as commission, can serve as the basis for finding an unconstitutional policy or custom.

26  Oviatt v. Pearce, 954 F.2d 1470, 1477 (9th Cir.1992).   Plaintiff has provided evidence of other

27

28                                           52

occasions where LiCalsi had Benabente speak with other individuals about potential charges if they did not take certain actions.   Plaintiff has provided evidence that these other occasions were not given D.A. investigation numbers and were done for the benefit of people LiCalsi knew. Based on this evidence, a jury could find that LiCalsi created a custom for the County of Madera of handling matters for LiCalsi and his friends "off the books" by threatening prosecution when there was no formal investigation and prosecution.   Thus, there is evidence that a custom was the moving force behind the violations here.

### *4.  Training and Supervision*

Plaintiff also argued in his opposition and at the hearing that the County of Madera did not oversee its employees and did not properly train them.   There is no evidence before the court regarding the County of Madera's oversight and training.    There is no authority to find that the very fact the alleged constitutional violations occurred is sufficient to show a failure to oversee and train.   Thus, the court will not allow the Monell claim to proceed on a failure to oversee and train theory.

Accordingly, the court will deny summary judgment to the County of Madera on the theory that LiCalsi, as a policy maker, committed the constitutional violations, and on the theory that a custom created by LiCalsi was the moving force behind the constitutional violations. However, the court will grant summary judgment to the County of Madera on the theory that the County did not oversee its employees and did not properly train its employees.

### ORDER

Based on the above memorandum opinion, the court ORDERS that:

1.    Defendants' motion for summary judgment in favor of LiCalsi on the Fourth Amendment claim is DENIED;

2.    Defendants' motion for summary judgment in favor of LiCalsi on the substantive due process claim is GRANTED;

53

3.    Defendants' motion for summary judgment in favor of LiCalsi to the extent he is sued in his official capacity is GRANTED;

4.    Defendants' motion for judgement in favor of the County of Madera is DENIED to the extent Plaintiff's theory is that LiCalsi, as a policy maker, committed the constitutional violations and to the extent Plaintiff's theory is that there was a custom of informal investigations and threats created by LiCalsi that was the moving force behind the constitutional violations;

5.    Defendants' motion for summary judgment in favor of the County of Madera is GRANTED to the extent Plaintiff's theory is that the County did not oversee its employees and did not properly train employees;

6.    This civil rights action will proceed against LiCalsi in his individual capacity for a violation of Plaintiffs' Fourth Amendment rights and against the County of Madera for a violation of Plaintiffs' Fourth Amendment rights on the theory that LiCalsi, as a policy maker, committed the constitutional violations and the theory that there was a custom created by LiCalsi that was the moving force behind the constitutional violations;

7.    The pretrial conference in this action is set for December 8, 2005, at 8:30 a.m.; and

8.    The parties shall file and serve their joint pretrial statement by 4:00 p.m. on December 6, 2005.

IT IS SO ORDERED.

**Dated:     November 30, 2005**                      **/s/ Anthony W. Ishii**
0m8i78                                        UNITED STATES DISTRICT JUDGE

54